[No. 27483.   Department Two.   January 8, 1940.]

FRANCES HOOVER, *Appellant*, v. CLARK C. GOSS
*et al., Respondents.*[1]

*Matthew W. Hill,* for appellant.

*Eggerman & Rosling* and *Walser S. Greathouse,* for respondents.

GERAGHTY, J.—The plaintiff was severely burned through contact with a hot radiator while in the office of the defendant Dr. Clark C. Goss for medical treatment.   In her action for damages, tried to a jury, the

[1]Reported in 97 P. (2d) 689.

court granted a motion for nonsuit at the close of her case and rendered judgment dismissing the action. This appeal follows.

The respondent Roosevelt Clinic, Inc., owns the building in which Dr. Goss maintains his office. The clinic's corporate stock is held principally by physicians having offices in its building, although some shares are owned by outsiders. The respondent Goss owns twenty-two of the corporation's five hundred shares. He pays rent as a tenant to the corporation, but the corporation in no way shares in his earnings. Clearly, the appellant made no case against the clinic, and the judgment of dismissal as to it was proper. Dr. Goss will hereafter be referred to as if sole respondent.

The appellant does not contend that the respondent was in any way negligent in respect to the diagnosis of her ailment or its subsequent treatment. The specific acts of negligence charged in the complaint are that, in disregard of her weakened physical and nervous condition, and "contrary to the usual practice in like cases in this locality and similar communities," the respondent (1) left her unattended in the examination room; (2) overheated the room and failed to properly ventilate it; (3) left the radiator exposed without any protecting device to guard patients against contact with it; and (4) failed to rescue her from "her predicament or to investigate her condition in said small unventilated and overheated room for the period of time during which she lay unconscious therein."

The respondent is a physician specializing in internal medicine and diagnosis. The appellant, thirty-three years of age, came to him first for treatment October 31, 1932. After an examination, he determined that she had spastic colitis. She was thereafter treated by him for that ailment, coming to his office at intervals of ten days or two weeks. She came to respondent's

office February 4, 1933, and was ushered into a treatment room and directed by respondent to undress and lie on the treatment table. She did so, removing all her clothing except a blouse. The room was about six and a half by seven and a half feet in size and was heated by a steam or hot water radiator. In addition to the treatment table, which was about five and a half feet long and two and a half feet wide, the room was equipped with a single chair, a small table, and a sink. The chair stood near the foot of the examination table and not far from the radiator.

After making the customary examination, the respondent gave the appellant a pelvic treatment, involving the application of a Phenol solution at the cervix or mouth of the uterus. The solution is an antiseptic, effective to destroy any superficial unhealthy tissue; it has a slight anesthetic effect, limited, however, to the point where applied. There was no nurse in attendance on this occasion, nor on any of the occasions when she had been treated before, and the appellant admitted that there was no need for the presence of a nurse during treatment.

After administering the treatment, which consumed about two minutes, the respondent remained in the room about three minutes longer to dispose of his instruments and wash his hands in the sink. He then left the room, the appellant being still on the table. ' He testified that he told her to "lie there a moment until you feel all right; then get up and dress." Appellant testified that, as he went out, he told her simply that she could dress. She said the treatment seemed to hurt "all the way through me. I was kind of nauseated on my stomach and it hurt on top of my head." Detailing what occurred after the respondent left the room, she testified:

"Q. When he left the room state whether or not he closed the door. A. He closed the door, yes. Q. Then what did you do, Miss Hoover? A. I stepped—I got off the table and reached for my clothes, and my head was still hurting on top—right up in here (indicating), and I put my head down, like this (indicating) on the table. I didn't know what was the matter. I felt so bad all over and I thought that I would better sit down, and I moved over toward the chair. Q. Where was the chair situated with reference to the table that you were on? A. Just a couple of feet from the end of the table. . . . Q. Then did you look down, or can you remember whether you looked around to see whether there was a chair to sit down in, or anything like that? A. I didn't look around. I knew that it was there. I just unconsciously knew that it was there, and I went to sit on it. . . . Q. Did you move the chair at all from where it had been in order to sit down? A. No. Q. You simply sat down in the chair in the position it was in? A. Yes. Q. Then what occurred, Miss Hoover? A. The next thing I knew I was lying with my head down on the floor, with the back of my neck against the radiator and the pipes down there—there were a lot of pipes there. Q. Where was the radiator with relation to the position of the chair when you sat down in the chair? A. Right off to the right. Q. How far away from the chair when you were seated? A. Right next to it, I think. Q. What would you say in inches or feet? A. I would say about that far away from it (indicating). . . . Q. Now, when you became conscious, what position were you in, so far as the chair was concerned? A. I went off of the chair this way (indicating), and I missed the back of it. Of course, I was very much dazed when I came out of it. Q. Was your back still against the radiator? A. Yes, when I came to. . . . Q. What was the condition of the temperature in the room when you went in there? A. It was pretty warm. Q. Did that condition continue? A. Yes. . . . Q. . . . tell the jury what you did, after regaining consciousness, as far as leaving the room was concerned. A. I slipped into my skirt and went out into the office

where Dr. Goss was, and I told him that I had fainted and had fallen on the radiator and burned myself. He looked at me and he said, 'I should say that you did burn yourself.' . . . "

Asked to estimate how long she remained unconscious, she answered, "I think it must have been fifteen or twenty minutes. I don't know." After regaining consciousness, she suffered no pain from the treatment administered.

The respondent, called as an adverse witness by the appellant, testified that, in most doctors' offices in the city of Seattle, the radiators used to heat them were not protected by a covering; that the treatment table used at the time of the accident was of the type customarily used. He estimated the temperature of the room, at the time of the appellant's treatment, as between seventy-five and eighty degrees, explaining, "We plan to keep the room quite warm because patients, of course, have their clothes off while they are getting on and off the table"; that there would not necessarily be any danger in having a temperature as low as seventy-two degrees, "but the patient would find it uncomfortable." February 4th, the day when the appellant was burned, was quite a cold day.

He testified that the treatment room and its equipment was of the type customarily in use in the average doctor's office in the city of Seattle. The treatment administered the appellant is quite common and given by physicians almost daily, and there is nothing about it that the average doctor considers as likely to cause a patient to faint. Ordinarily, a nurse would not be in the room after the treatment was given.

"If the patient obviously was in great distress from that treatment or any other kind of treatment, the nurse would be asked to stand by. . . . Women are usually sensitive about stepping off the table without

any clothes on in the presence of anyone else in the room, whether it be a nurse or not."

■ We do not think that negligence can be predicated upon the manner in which the room was equipped, nor on the presence of the hot radiator. The immediate cause of the accident was the fainting of the appellant. The presence of a radiator in the room was but a condition. Falling in a faint, she might have sustained serious injury in other ways, as by striking her head on the floor or against some other object in the room. It might be inferred, from the stress laid by appellant upon the respondent's advice to her to dress immediately, that, if he had advised her to remain for a while on the table, he would have been free of negligence. But if she had fainted on the narrow, unguarded table, there would have been the possibility of injury from a fall to the floor.

■ Since negligence will not be presumed, the question is whether the evidence produced by the appellant, in itself or in the reasonable inference to be drawn from it, would warrant a finding of negligence by the jury predicated upon the respondent's failure to have some one in attendance upon the appellant after administration of the treatment.

The appellant, in her complaint, sets out the standard by which the respondent's professional conduct is to be measured, namely, "the usual practice in like cases in this locality and similar communities." Now, other than the testimony of the respondent, the appellant produced no evidence as to what was the usual practice in like cases in the locality. The trial court granted a motion for nonsuit on the ground that, in the absence of the testimony of qualified practitioners, the jury could only speculate on what the respondent should have done in the circumstances. Indeed, the appellant

produced neither medical nor lay testimony on the issue.

What was said in *Inglis v. Morton,* 99 Wash. 570, 169 Pac. 962, is applicable here:

"It may be conceded that, in malpractice cases, the case is made by the nature of the testimony and not by the profession or calling of the witnesses, as is said in *Wynne v. Harvey,* 96 Wash. 379, 165 Pac. 67. There are many conditions and effects relevant to a malpractice case 'concerning which even a layman is possessed of knowledge sufficient to render his evidence on such a subject competent.' There was in this case, however, no testimony from either lay or expert witnesses to the effect that the treatment of the respondent was unskillful or improper or that it was the proximate cause of any injury complained of by appellant."

The judgment is affirmed.

BLAKE, C. J., BEALS, STEINERT, and JEFFERS, JJ., concur.