[No. 29608. *En Banc.* November 1, 1945.]

HARRY FRITZ, *Respondent,* v. FRANK L. HORSFALL, *Appellant.*[1]

[1]Reported in 163 P. (2d) 148.

*Robert S. Terhune* and *Truscott & Bovingdon,* for appellant.

*George F. Hannan,* for respondent.

SIMPSON, J.—This action was brought to recover damages for malpractice. The case tried to a court and jury resulted in a verdict in favor of the defendant.

The plaintiff presented a motion for a new trial upon several grounds. The motion was granted by a general order, without the giving of any reasons therefor. Defendant has appealed from the order to which we have just referred and assigns as error the granting of plaintiff's motion for a new trial.

■ The rule in those cases in which the order granting a new trial is general and does not specify the grounds upon which it was rested will not be disturbed by this court unless it finds that the evidence was not sufficient to warrant the court in submitting the case to the jury. The rule is well stated in the following excerpt from *Henry v. Larsen,* 19 Wn. (2d) 690, 143 P. (2d) 841:

"Where the order granting the motion for a new trial is general and does not specify the ground or grounds upon which it was based, our inquiry is limited to the determination of the question whether the evidence was sufficient to take the case to the jury. *Hobba v. Postal Telegraph Co., ante* p. 97, 141 P. (2d) 648. Unless we can say in such case that the verdict of the jury was, as a matter of law, the only verdict that could be rendered, the order granting a new trial must be affirmed."

Under the above rule it becomes necessary to examine the statement of facts and the numerous exhibits admitted in evidence. In doing so it will be necessary to give full credit to the evidence favorable to respondent and the reasonable inferences to be deduced therefrom.

■ Before referring to the facts, however, it seems advisable to set out certain general rules of law governing actions for malpractice which are almost universally accepted by the courts and which are applicable to the present situation. We set them out as follows: (1) An individual licensed to practice medicine is presumed to possess that degree of skill and learning which is possessed by the average member of the profession in the community in which he practices, and that he has applied that skill and learning with ordinary and reasonable care to those who come to him for treatment. (2) The contract which the law implies from the employment of a physician or surgeon is that the doctor will treat his patient with that diligence and skill just mentioned. *Sawdey v. Spokane Falls & N. R. Co.,* 30 Wash. 349, 70 Pac. 972, 94 Am. St. 880. (3) He does not incur liability for his mistakes if he has used methods recognized and approved by those reasonably skilled in the profession. *Wells v. Ferry-Baker Lbr. Co.,* 57 Wash. 658, 107 Pac. 869, 29 L. R. A. (N.S.) 426; *Peddi-*

*cord v. Lieser*, 5 Wn. (2d) 190, 105 P. (2d) 5. (4) Before a physician or surgeon can be held liable for malpractice, he must have done something in the treatment of his patient which the recognized standard of medical practice in his community forbids in such cases, or he must have neglected to do something required by those standards. 48 C. J. 112. (5) In order to sustain a judgment against a physician or surgeon, the standard of medical practice in the community must be shown, and, further, that the doctor failed to follow the methods prescribed by that standard. (6) It is not required that physicians and surgeons guarantee results, nor that the result be what is desired. *Williams v. Wurdemann*, 71 Wash. 390, 128 Pac. 639; *Lorenz v. Booth*, 84 Wash. 550, 147 Pac. 31; *Dishman v. Northern Pac. Beneficial Ass'n*, 96 Wash. 182, 164 Pac. 943; *Howatt v. Cartwright*, 128 Wash. 343, 222 Pac. 496; *Barker v. Weeks*, 182 Wash. 384, 47 P. (2d) 1. (7) The testimony of other physicians that they would have followed a different course of treatment than that followed by defendant, or a disagreement of doctors of equal skill and learning as to what the treatment should have been, does not establish negligence. In such cases, the court must hold that there is nothing upon which the jury may pass, the reason being that the jury may not be allowed to accept one theory to the exclusion of the other. *Howatt v. Cartwright, supra; Kemp v. McGillivray*, 129 Wash. 592, 225 Pac. 631; *Hollis v. Ahlquist*, 142 Wash. 33, 251 Pac. 871; *Peterson v. Hunt*, 197 Wash. 255, 84 P. (2d) 999. (8) Negligence on the part of the physician or surgeon by reason of his departure from the popular standard of practice must be established by medical testimony. *Wharton v. Warner*, 75 Wash. 470, 135 Pac. 235; *Dahl v. Wagner*, 87 Wash. 492, 151 Pac. 1079; *Dishman v. Northern Pac. Beneficial Ass'n, supra; Howatt v. Cartwright, supra; Brear v. Sweet*, 155 Wash. 474, 284 Pac. 803; *Jordan v. Skinner*, 187 Wash. 617, 60 P. (2d) 697; *Peterson v. Hunt, supra; Hoover v. Goss*, 2 Wn. (2d) 237, 97 P. (2d) 689; *Peddicord v. Lieser, supra; Crouch v. Wyckoff*, 6 Wn. (2d) 273, 107 P. (2d) 339. The reason is that juries must be informed as to the facts or criterion upon

and by which the standard of ordinary skill and ordinary care and diligence rests and is regulated by the medical profession. To supply the need, evidence may properly be introduced to show such facts. This evidence, from the very nature of the case, must come from men learned in the profession because other witnesses are not competent to give it. Jurors and courts are not in any way conversant with what is entirely peculiar to the practice of medicine and surgery. They may not arbitrarily determine the proper methods of treating an ailment—that is a medical question. *Ewing v. Goode,* 78 Fed. 442.

An exception is recognized in those cases in which negligence is so grossly apparent that a layman would have no difficulty in recognizing it. *Helland v. Bridenstine,* 55 Wash. 470, 104 Pac. 626; *Williams v. Wurdemann,* 71 Wash. 390, 128 Pac. 639; *Wharton v. Warner,* 75 Wash. 470, 135 Pac. 235; *Wynne v. Harvey,* 96 Wash. 379, 165 Pac. 67; *Swanson v. Hood,* 99 Wash. 506, 170 Pac. 135; *Jordan v. Skinner,* 187 Wash. 617, 60 P. (2d) 697; *Crouch v. Wyckoff, supra.*

We deem it proper at this time to give a description of the gall bladder, its location, and the ducts connected therewith, as described in 7 Practice of Medicine 140, edited by Frederick Tice, M. D., published in 1944.

"The gall bladder is a pear-shaped sac having a thin, flaccid wall and a capacity of from 30 to 50 cc. It is attached to the undersurface of the right lobe of the liver by a loose connective tissue network rich in lymphatics and small blood vessels. A peritoneal coat incompletely surrounds the gall bladder and is reflected over the surface of the liver, thus leaving an extraperitoneal surface which is in direct relation to the liver. In a variable percentage of cases—Judd placed it at 10 per cent—the gall bladder is completely surrounded by a peritoneal investment forming a mesentery-like attachment. According to Erdheim, this loose, leaf-like attachment may allow angulation and produce stasis or may predispose the organ to torsion.

"The gall bladder can be divided roughly into two parts, the fundus and the neck. The fundus is the sac-like portion which extends downward and forward from the neck and may extend beyond the border of the liver. The tip may

be completely surrounded by a peritoneal coat. The neck of the gall bladder makes an acute angle with the fundus and points upward, thus forming a pouch which is known as Hartman's pouch. The cystic duct is a direct continuation of the neck and extends downward, backward and to the left to form a Z-shaped contour. Its length is approximately 4 cm., although there is great variation. It may join with the common duct at practically a right angle, in which case it is very short. Again it may follow along the common duct for some distance and finally communicate with the latter at a very acute angle, forming a double-barrel gun arrangement. The diameter of the cystic duct is, as a rule, the narrowest of any of the extrahepatic ducts, varying from 2 to 4 mm., and its mucosa is thrown into five to twelve folds of a crescentic arrangement, the valves of Heister, which project into the lumen of the duct.

. . .

"The intrahepatic biliary ducts unite within the substance of the liver to form the two major hepatic ducts, the right and the left. These two ducts, which are of about equal size, unite to form the common hepatic duct at a variable location, at times the junction being not over 0.5 to 1 cm. from their exit from the liver. The common hepatic duct extends downward and to the left to give off the cystic duct to the gall bladder. From this junction onward it is called the common duct. The common duct is from 7 to 8 cm. in length, 4 to 6 mm. in diameter and lies in the free border of the duodenohepatic ligament in close anatomic relation to the portal vein and the hepatic artery. It passes behind the descending portion·of the duodenum, passing through a groove or furrow in the lateral surface of the pancreas. Occasionally the terminal end of the duct is completely embedded in the pancreas. It passes obliquely through the wall of the duodenum to empty into the bowel at the papilla. This terminal end of the common duct is in close anatomic and physiologic relation to the major pancreatic duct. These ducts may join to form a common ampulla and empty into the bowel through a common orifice; less frequently they open separately. The detail of anatomic peculiarities ranges from a high junction with a well-developed ampulla to a septum arrangement which prevents any interchange of intraductal contents."

Respondent contacted appellant in 1943, at which time he complained of heartburn. Appellant took X-ray pictures of respondent and advised an operation to remove the

appendix and gall bladder. The operation was performed on the ninth day of March, 1943. Respondent remained in the hospital until March 30th, at which time he returned to his home in the care of a nurse. While at home the wound discharged bile and, at one time during the first part of May, a piece of gauze was pulled from the wound by respondent's mother. His mother thought that the gauze was a piece of the intestine. It had a bad odor and was soaked and discolored. The wound continued to discharge until the month of July. During that period of time, respondent suffered from fever and chills. At times he coughed and vomited blood and bile. In July, appellant opened the wound on several occasions. After each treatment respondent would feel better. During the last part of July or the first of August, 1943, respondent returned to the hospital, at which time a second operation was performed. After a stay of seventeen days in the hospital, he felt better and returned to his home. After the wound healed respondent started to run a fever. Appellant then opened the wound to allow further drainage. The wound again healed and respondent "got deathly sick." He coughed and suffered from chills. Respondent then went to the hospital. The wound broke open and emitted a quantity of bile and blood. Respondent again returned to his home, and later went to appellant's office, where an injection of fluid was made, and an X-ray picture taken. During a conversation with appellant, as related by respondent, appellant stated, in speaking of other doctors: "They told me I made a slip;" and then said: "Now, listen, you know that any man can make a slip, but I know I didn't."

December 3, 1943, respondent arrived at the Mayo clinic at Rochester, Minnesota, at which place an operation was performed about the middle of December by Dr. Counseller. Later a post-operation was performed. He was discharged from the hospital at Rochester, January 19, 1944, and returned to Seattle. After returning to his home, respondent "felt like I was on the road to recovery." Later he had jaundice, chills, and fever. Dr. Willis waited on respondent

and administered a sulfa drug. Respondent then called on Dr. Bannick, who administered sulfadiazine.

In May, respondent returned to Mayo's. He was examined by Dr. Counseller. About the third or fourth of June respondent returned to Seattle and then suffered from fever, jaundice, and infection. He again journeyed to Rochester, where he remained about one month, during which time another operation was performed by Dr. Counseller. Later, in September, he made another trip to the Mayo clinic, where he stayed for a period of ten days. At that time a duodenal drainage was given respondent. Returning to his home again, respondent continued to suffer from jaundice, fever, chills, and infection. He then went to the Swedish hospital in Seattle and was attended by Dr. Bannick, after which he "felt somewhat better."

Respondent testified that, after his return from Rochester, he had a conversation with appellant, in which he told appellant that he had been compelled to go to the Mayo clinic, which cost him "considerable money," and felt that appellant should help him; that appellant replied, "I fully agree with you;" and, "I intend to help you but first I want to write to the Mayo clinic and verify what they have done, and then I will get in touch with you." Later, he called appellant, and he was told by him that he, appellant, had done nothing wrong.

After the first operation, respondent made two trips to Spokane, driving his automobile both ways. He went fishing and while so doing waded in a stream. The drainage from the incision ceased after respondent's first trip to the Mayo clinic.

The facts just related were supplied by respondent, his sister, his wife, father, mother, and other friendly witnesses.

Appellant was then called by respondent's attorney and testified, in effect, as follows:

He is a physician and surgeon and has practiced in the city of Seattle for forty years. He was graduated at McGill university. The nature of his practice is diagnosis, X ray, and surgery, and he has performed a great many gall-

bladder operations. When questioned about his eyes, he testified that he had no trouble with them except that he had worn glasses since he was twenty years old. Asked about his glasses, the witness explained that they were so arranged as to accommodate a slight droop of the eyelid, but that did not have anything to do with his eyesight; that he did not have defective vision.

The doctor stated that respondent first complained of a stomach trouble that had been present since he was a child. The diagnosis made by the doctor was based, however, upon the examination which he had made. That examination consisted of an inspection of the patient's breast, his abdomen, his reflexes, and by means of X-ray pictures. Appellant, on being asked if he found anything in the abdomen, said:

"There was some complaint on deep pressure above the first margin, that is where the ribs are attached and where the abdominal wall begins, and on pressing deeply on that upper portion which is known as the right upper abdominal quadrant, there was a rigidity; that is, the muscles were not flexing as they ordinarily do, and it seemed, too, that the patient had some recovery on pressure.

"On further examination throughout the abdomen I found that the liver was very—at least enlarged, but it was enlarged. The spleen was normal in size and in position."

Several X-ray pictures of respondent's stomach were made by appellant and admitted in evidence. A gastric analysis was also made, and appellant determined that respondent's gall bladder was "not functioning properly;" and that he was suffering from colonitis, "a diseased condition, inflammatory in character, of the gall bladder."

Answering more specifically, appellant stated:

"I conclude from the whole examination, the physical examination, the laboratory examination and the x-ray, I concluded that this gentleman had a diseased gall bladder and a diseased appendix."

The appellant gave a minute description of the operation of March 9th. Laying aside certain explanations, he described it in the following manner:

"When we decide to look up in this portion here, before

attempting to lift up the margin of the liver, we like to see that gall bladder can be definitely visible, if we can look at it, . . . The liver is turned back, yes, so that the entire gall bladder may be exposed. You don't expose it as beautifully as that diagram [exhibit 17] shows it by any means, but you do expose it. In that way you try to determine the condition of these ducts, and when they are determined it is then decided in the mind of the operator what he is going to do.

"If there are a great number of adhesions present around this cystic duct and the other ducts, they are dissected from, and they are dissected from the same by means of scissors that are alluded to as blunt—I mean they have heavy blades; they are specially-made scissors that are known as dissecting scissors.

"When that is done, when the dissected duct is thoroughly identified; and, lying along that duct there are two vessels, the cystic artery and the cystic duct.

"There are two main methods of determining what you ought to do. There are several methods to be pursued, depending on the judgment of the operator, and I will just describe the two main ones. One is to grasp in one instrument the cystic duct, the cystic artery and the vein together in one bit of the forceps. The other is to dissect from the artery and the vein and then clasp these separate and make use of the instrument that is used for that, and a very, very fine forceps. Of course there are two legs to it and it is about as fine as that, only there are two of them, like a scissors. And that is so fine that it is not going to injure anything; it just picks them up, vein and artery.

. . .

"Then there are a pair—they are together really—but they are known as a pair of forceps. Pick them up, if you want to do it that way. If you don't want to do it that way, then you can pick the duct, the artery and the vein together.

"I have here two instruments that are known as gall-bladder clamps. . . .

"Now, here is the gall bladder, and the operator can take it where he pleases. He can take it high up toward the gall bladder itself, or he can go farther down. Many point it even closer to the common hepatic duct, if he wishes. That is a matter for his judgment.

"Then this instrument is placed across the duct, taking up—which is very commonly done—the artery and the vein. And then the other one is placed below it like that (indicating) and then by means of a sharp scalpel, surgical

knife, it is cut. Q. What is cut? A. The duct. Q. What duct? A. The cystic duct, where I have the clamp. . . . Then when that is cut the operator does whatever in his judgment is wise at the time. He may leave this on until he removes the entire gall bladder. That is at the end away from him.

"Well, suppose that these forceps are lying across here and here and they are cut between. Now then, that frees this up. It doesn't free the gall bladder, but it frees this portion of the duct. Q. The cystic duct? A. The cystic duct, that is the only portion of the duct I am talking about. And the lower forceps is left in position, and I will tell you why in a few minutes. Then the gall bladder is dissected free from its bed, its bed being the liver. Again, there are various ways of doing it. Some men turn it up and dissect it from here upwards, or here, it is from the bottom downwards, but in this picture it is the other way. Or, the method which I most frequently use, a little incision is made in that covering of the gall bladder, which is again that serous sac that is known as the peritoneum. That is just very gently incised, not going into the gall bladder at all, because the gall bladder has several layers.

"That, by means of blunt dissection, using this to guide us, is peeled back and when the gall bladder is completely freed it is lifted out. Under certain circumstances this peritoneum is stretched across. Sometimes it is and sometimes not. . . . After the gall bladder is out, then the peritoneum is closed over. Sometimes it is too friable and won't stand too much, but it should stand it, to go back in. And the purpose of putting that in there is in the hope of avoiding any connection—I mean by means of adhesions—between any portion of the bowel and this liver bed. When that is done, this duct is treated. . . . This cystic duct which travels down, as you see in the diagram, to this common duct. Then that is ligated, tied from this, only I don't like the term. There are, again, more than one way of doing that. Some physicians just compress a ligature around that cystic duct and tie it. That works very well sometimes. Sometimes it doesn't.

"A great many years ago I figured that a much wiser procedure and one which I have carried out ever since, is to place a ligature from this, throw the gut away from these forceps. It comes out here and comes out here. And the needle is unthreaded so that there is no needle there, and you have got this tied. It is my habit to tie at the heel of the instrument first, then to bring my tie around in

front, and again to have it ready, and as I say, 'ready' to my assistant this is taken off and the tie is completed and then crossed over this thing just about as tight as you can possibly tie it. Of course you are not pulling on a rope and you are not trying to anchor a boat, but you are trying to close this duct. And that is the way in which it is done, and that is the method that was pursued here.

"When that is down to the field of the operation, that is the area of the gall bladder, the common duct, common hepatic duct are examined very carefully to make sure that everything is as it ought to be; that there is no hemorrhage and that there is no bile coming out of the cystic duct, as far as can be determined—and usually you can fairly well determine that.

"Then, following the judgment of the operator again, one of two things is done: There is always one done and in many cases two. Some men are perfectly satisfied to close up the abdominal cavity without any drainage at all. Now, that depends upon circumstances. Others put in two drains.

"Now, we come back to this incision. The operative procedure in the abdomen is completed and we are ready to close over this incision which, remember, is five layers.

"Many operators, in the face of certain infection, feel that they want to put their drainage in through the abdominal wall, that is through the incision. A good many of them for a great many years have felt that that was not a very wise procedure; that there was a better one. And the reason we do not think it a wise procedure is because it weakens the abdominal wall and tends to produce rupture, or as we speak of, hernia, a separation of some part of the wall.

"So there, too, I think I am safe in saying for 25 years I haven't put a drain in through the abdominal incision except under very rare circumstances. And I am not talking now of drains in gall-bladder operations only, but drains in the abdominal cavity. I find if it is possible—it is not always possible—but if it is possible I haven't been putting a drain through the abdominal incision. Instead of that, we take a scalpel and we make a deep nick in the skin, perhaps about that size, maybe a little longer; not always as long as that and sometimes a little longer. That is an incision in the skin and the fat only. The scalpel does not go through into anything.

"Then, using a pair of artery forceps, which are similar to that only they haven't got this hook, if you can conceive

of that with the hook off. Then, this is a fairly large artery forceps. We then take one of these artery forceps and push it through the fascia to the muscle about the peritoneum without using a knife, excepting in cases where the peritoneum is very tense. If it is very tense, we can see where the point of the forceps is and we just make a little nick in the peritoneum and the forceps slips through. The abdomen is open all of this time.

"Then a piece of gauze, usually in rubber, fine rubber tissue about the consistency of a rubber glove which you have all seen—I don't mean the household rubber glove which you use in kitchens, but I mean the thin rubber glove which is used in surgery, rubber of that consistency which is already prepared, and insert in that. I use my handkerchief for the purpose of demonstrating it.

"A piece of gauze has been inserted, and they are always there in the surgery—and it is down at one end and out at the other. It is then cut short enough so it is not doing any harm as far as we are able to determine, and it has been used hundreds of thousands of times. Then that is taken and is placed into the abdominal incision. The incision is still wide open.

"Remember, all of that time you have these artery forceps in that wound, which is spoken of as a stab wound, and that instrument is in there. We then pick this end up and pull it out, leaving the rest of the drain in the abdominal cavity. Then the abdomen is closed and it is closed in layers. It was opened in layers and it is closed in layers.

"The first layer then is closed, then the peritoneum, that fine membrane which is everywhere, and it is closed. Then, in doing that the muscles were separated but not cut. Usually three sutures are put in these muscles, from side to side. They come in here like this and like this (illustrating). Now, they are not tightly drawn together; they are fairly an approximation, so as to obviate what is spoken of as dead spaces. I don't think I can make that term any clearer, but that is what is known in surgery as dead spaces. Then they are brought together jointly and tied.

"Then that layer of fascia which I showed you yesterday in trying to illustrate by means of that cardboard-like paper, is closed; and that is closed, not with continuous running sutures, but sutures which are placed at intervals of perhaps an inch or three-quarters of an inch, depending again upon the judgment of the operator. You may put in eight or ten or you may put in four or five. And part of the

determination is decided by the length of the incision they are to do, and it is closed.

"Then the fat, the second layer from the outside, is also closed. It is closed in one of two ways. Very frequently it is closed by putting in half a dozen common fine catgut sutures, again to obviate dead spaces. And sometimes it is closed by a running suture. . . . A running suture—if this is your incision here, a running suture is placed inside so this is not outside, and on a fairly good-sized needle, perhaps about the size—oh, maybe that long (indicating)—but it is a curved needle and goes over here and crosses over here and comes along like this; and that is known as a running suture. This end is tied before you start and as you keep on going the layer of the fat is being approximated, and when you get here you tie it and the excess is cut and tossed away. Then the skin is closed. . . .

"Then, again, something may be done and it may not, depending again upon the attitude of the operator, the patient on the table, what the man is going to do. Is he a bookkeeper? Is he a machinist? Is he a doctor, a lawyer, or a football player? All of these enter into the judgment of the operator as to what treatment, that is in addition to what I have pointed out, is to be done. This is the usual procedure, and I did this with Mr. Fritz.

"If we felt that wound should be more firmly reinforced, if we feel that there may be infection, then we take on a very large needle, a curved needle which, if stretched out flat, would be as long as from here to the end of the pencil. But it is a curved needle like this (indicating).

"A suture is placed through this end of the needle and again that depends upon the judgment of the operator. He uses either heavy silk or uses what is known as silk-worm gut. Silk-worm gut is a white tension suture that looks like silk and is not absorbed easily. All of these sutures that I have mentioned before, nature eats them up by means of leukocytes and they are absorbed in the course of time, depending upon various things.

"And then this large needle, if you are going to do what I did, is placed through all the layers of the incision excepting the peritoneum. That is done before these layers are closed. The peritoneum has been closed before that is put in but the rest are not closed until these are inserted, not tied, inserted. There may be four and there may be six. They may be straight below or not, and they come through 1, 2, 3, 4 or 6. They come in parallel, run through the skin, through the fat, through the fascia, through the

muscle, underneath the muscle and out the opposite way, through the muscle, fascia, fat and skin, and then are laid aside on the appropriate towels and sheets that are there.

"Then the entire wound is sewed up and then these sutures are sewed over—I mean are tied over. . . .

"Then the last step is a safety pin is inserted through this gauze where it comes out of the stab wound that I have referred to. The purpose of that safety pin is to see that no accident can occur to the gauze and it cannot possibly get into the abdominal cavity. Some men, instead of putting in gauze, put in a rubber tube. If they put in a rubber tube, it may be six inches long—I mean inside the abdominal cavity. And the rest of it may be whatever the operator wants. It can be ten or twelve inches long. Then it is attached to a piece of gauze tubing, one end of which goes in here and the other end is attached to a ring, piece of rubber, which goes down into a receptacle and is at the side of the bed. If the operator expects, which we sometimes do, a large amount of bile flowing for the next two or three days, that is the procedure. If we don't expect that, you put in your gauze and start that in, retained by that alone. Q. Doctor, you put in gauze in this case? A. I did. That is my usual procedure unless I have a reason for doing something else."

Respondent suffered much pain after the operation, and a large amount of blood and bile came through the incision. One time appellant ran a steel probe into the wound, and a small amount of bile came out. Appellant and the nurses placed many dressings on the incision. Respondent also suffered from jaundice and had chills and fever.

Jaundice is caused by the bile being dammed back into the liver and then into the bloodstream. Appellant stated that the fact that bile was coming out through the wound indicated that the bile was being blocked. Asked if, in cutting the cystic duct, he had come close to the common hepatic duct, the doctor answered: "On the contrary, I knew I had not come close to it." In accounting for the flow of bile, the doctor said it might be due to the result of disease, a stricture in the remaining duct, or it might come from an accessory duct. Speaking of accessory ducts, he testified:

"They are ducts that are not commonly found. They are

something that nature supplies—why, we don't know, but they are there. They are not always there, but they are sufficiently frequent so that they are always in the mind of the operator, and is an added reason to the ones that I have given before for putting drainage into the abdominal cavity after the removal of the gall bladder."

At the hospital the patient was given medicine to relieve his pain and to assist his recovery, and numerous tests were made to ascertain his condition. After respondent returned to his home subsequent to the first operation, appellant visited him on twenty-five occasions. On many of these visits he dressed the wound. In testifying about the gauze that was pulled from the wound, which respondent and his family thought was an intestine, appellant testified that a piece of gauze, mixed with iodine, or some sulfa compound, had been laid in the wound. It was one of those pieces that had been found by respondent's family. Appellant said that the gauze had been changed every second or third day, and became foul; further, that gauze placed in a wound of the nature of the wound had by respondent would become infected and would smell badly, but that there was nothing unusual in that condition or anything unexpected.

The doctor denied that he had ever told respondent that he was entitled to help or money.

Appellant operated on respondent again on August 3, 1943. The record of the operation, known as "exploratory laparotomy," is as follows:

"Patient under pentothal sodium anaesthesia which had been preceded by a 1/4 grain of morphine and 1/150 atrophine. Following the usual skin preparation reenforced with alcoholic solution of Gentian violet, a double V-shaped incision was made enclosing the scar tissue in the skin in the upper right abdominal quandrant. The scar tissue of the fascia was incised and the abdomen opened, great care being taken not to injure any of the sub-adjacent structures in case they were adherent.

"On opening the abdomen and exploring towards the right in the abdominal parietes, an abscessed cavity filled with bile was found. This was emptied and explored. It went up high on the right almost under the liver. No pus was present that I could determine, but the cultures were made. The

hepatic flexure was found to be adherent over to the right to the abdominal wall by very dense adhesions indeed, and the duodenum was somewhat misplaced to the right. These adhesions were broken down as far as possible and large masses of adhesions were removed. These were inflammatory, somewhat recent character.

"The margin of the liver exuded some bile and this was touched with the coagulating part of the Bovee cautery. There was no evidence of any damage to the common duct, nor was there any evidence of anything blocking it. My opinion, therefore, that the clay-colored stools was due to pressure from within the abdominal cavity either from the pressure of the intestines against the duct or from the pressure of the abscess cavity from the right wall, which of course would be indirect. The abdomen was closed with drainage, a large drain being carried out from a stab wound higher up under the liver and posterior through the area which had contained the abscess in the abdominal wall. The abdominal wall was closed with through-and-through silk sutures, the silk being passed through the fascia, muscles, scar tissue, peritoneum, etc., and a very good closure was obtained. The margins of the fascia were then united with chronic catgut. Sulfanilamide was placed deep in the abdominal cavity along the area of the drain and where the abscess cavity had been. The fat was closed with interrupted plain catgut. Sulfanilamide was placed in the fat and a small rubber tissue drain was placed in the fat coming through the lower margin of the skin wound. Conditions good. Sponge count correct."

He stated that the adhesions were caused by infected bile.

At the second operation, he found evidence of cirrhosis of the liver, which he attributed to the infection.

Dr. Counseller, head of the section of general surgery at the Mayo hospital, testified as follows:

He contacted the respondent December 3, 1943, and, after examination, diagnosed his trouble as biliary fistula, which means the drainage of the bile from an abdominal sinus, or other opening or hole. The doctor operated upon respondent December 16, 1943, and at that time dictated the following report of the operation:

" 'Tertiary upper right rectus incision excising the scar. There was attachment of the hepatic flexure of the colon to the abdominal wall through which there was connection

with a sinus tract. This was excised and the opening in the colon closed with two rows of catgut and one interrupted row of silk. The sinus tract was then followed up above the liver, and an abscess was located between the dome of the liver and diaphragm. This abscess held about 300 c.c. of thick pus which was thoroughly evacuated. Five grams of sulfathiazole were placed in the cavity. One Penrose cigaret drain was inserted with the gauze filling the cavity. We were unable to find any evidence of extrahepatic bile ducts, but the entrance of the common hepatic duct was found. It was dilated, and a Sullivan tube, size 18, was placed in the common hepatic duct. A hepaticoduodenostomy was performed about 2 inches below the pyloric sphincter—mucous membrane-to-mucous membrane using silk. When the duodenum was opened, there was some bile in the duodenum. Just how it arrived there I am unable to say, but there is undoubtedly a duct somewhere that communicates with the duodenum. The stomach and spleen were otherwise normal. The liver was cirrhotic (grade 2). Five grams of sulfathiazole were placed in the peritoneal cavity. About three grams of sulfanilamide were left in the wound. Wound closed in usual manner.' " (A hepaticoduodenostomy, as explained by Dr. Bannick, means a connection between the liver duct and the duodenum.)

He found an attachment of the colon to the abdominal wall, with an opening in the colon. Asked how the hole was caused, Dr. Counseller stated:

"That would be pretty hard for me to say. You could get a hole in the intestine from being next to an abscess and sloughing taking place, or you could get a hole in the bowel from a drainage tube that you might have in there—that is not uncommon, due to the pressure and that sort of thing."

In explaining his operation, Dr. Counseller testified:

"As I said before, in second and third operations, these cases are pretty much the same. You have a tremendous amount of scar tissue, you have to separate the intestine from the under surface of the liver and you have to go in and hunt for the common duct. A great many times there is nothing to be seen. Sometimes you see something that is dilated and you stick a needle in there and if you get bile you know you are inside a duct. That is what I did in this case. I found the stump of the common hepatic duct and I was able to dilate that and put in a curved forceps and I got

into both right and left hepatic ducts, so I knew I was in the common hepatic duct, but I was unable to identify any evidence of ducts from that point down but that does not mean that the remnants of the ducts are not there—they may be involved in scar tissue."

Respondent left Rochester, January 19, 1944, and, according to the doctor, had a very remarkable recovery.

On respondent's return to Mayo's, May 29, 1944, he was examined by Dr. Counseller, who advised his return to Seattle. July 5, 1944, he again went to the clinic where the doctor removed the tube. Respondent then left for Seattle, July 28, 1944. He went back to Rochester, September 4, 1944, at which time he was suffering from jaundice.

On cross-examination, Dr. Counseller stated:

"Q. Is it true further that because of the large amount of infection and inflammatory changes that you found, and adhesions present, that identification of the common hepatic duct on the 16th day of December, 1943, was rendered very difficult? A. Correct. Q. And the reason that its identity was rendered difficult was because of the absence of landmarks, due to the inflammatory condition of the tissues, scar tissue making the identification very, very difficult? A. That is correct. Q. And that is why you did not say on the 16th of December, and do not say today, that there was not in existence the common bile duct, but that you only say that because of the inflammatory condition you were unable to determine its existence? A. That is correct."

Given the history of respondent's condition before and at the time of the first operation, Dr. Counseller said that he would not consider that immediate surgery was indicated. He then testified, on cross-examination:

"Q. Doctor, referring to your answer to the hypothetical question of whether or not you could recommend surgery, based upon the hypothetical question which was propounded to you, you I believe stated that possibly you could not recommend surgery but you did not mean by that, did you, doctor, that surgery if performed would be wrong or negligent or improper? A. For myself I think I would have to say that I did not believe there was sufficient evidence to warrant operation but other surgeons might think there was sufficient evidence to explore the gall bladder and appendix. Q. And based upon the data which was given to you as to

whether or not surgery was necessary on March 9th, 1943, there could be difference of opinion among competent men on that question? A. I think there could be difference of opinion. Q. Doctor, you have admitted that there could be an honest difference of opinion between competent medical men as to whether or not it would be advisable or inadvisable to operate, with the data as given you, on March 9th? A. That is right. Q. Now then, doctor, whether you do or do not operate, either one could not be considered negligent? A. I don't think so. . . . Q. And you specially made reference to the fact that if the patient happened to be here in Rochester of course it would be a lot easier for you to have him in the hospital and probably easier for the patient but whether or not he should have remained in the hospital at Seattle or whether he should have been dismissed, that question you do not presume to pass upon in any manner as to infer negligence in dismissing him, do you? A. No. Q. Neither do you as I understand it, doctor, pretend to be an authority on what constitutes ordinary care and customary competency in the region of Seattle, Washington, as employed and practiced by the average medical man out there, do you, doctor? A. No. Q. And neither was it your intention, as you gave the answers to any of the questions asked in this deposition that they should be construed as being above, below, or in accordance with standards at Seattle, Washington? A. I think that is correct."

Dr. Conrad Jacobson graduated from Johns Hopkins Medical School in 1911. He taught surgery at the Harvard Medical School and Brigham hospital, and has practiced surgery in Seattle for twenty-one years. He testified that he examined respondent on May 17, 1943, which was about eight days after the first operation. He stated:

"Oh, this man had a very severe infection following the operation, coming on rapidly just after the operation, and most probably was due to the infected bile which drained. Q. Would infected bile cause trouble in the liver? A. Oh, yes, infected bile causes trouble in the liver, yes, chills and fever, and the whole while kept a temperature, and so on. This man did have chills; had chills on the fourth day, if I remember rightly. Q. Can you, in your opinion, say whether or not that infection had been present before the operation? A. Oh, undoubtedly, in my opinion that infec-

tion was from the bile. He was draining immediately after. I can't remember a gall bladder like that, as I remember it, without having some bile come from the liver bed, and undoubtedly became infected from infected bile coming immediately after the operation."

Asked if it was proper to allow the patient to go home a short time after the operation, he said:

"Oh, yes. We let the patients go home; might as well drain at home as in the hospital. So, today, it is a question of expense."

In answer to a hypothetical question containing the facts as testified to by appellant, to which we have referred, concerning the second operation, he said that the adhesions were all the result of infection. Dr. Jacobson testified further:

"Q. Doctor, if there were infection, as has been set forth briefly to you, at the operation in August and also in Mayo's in December, what would you say as to the presence of infection and the inflammatory changes, adhesions, as to whether or not they could block the bile duct? A. Yes. Undoubtedly the bile duct is either under all of that scar tissue or else it has sloughed off. There are only two things that can happen in that case. One is that the bile duct sloughed off on account of the infection, or it was covered over by the scar; and it is impossible to go down and get that scar out. Q. If there had been no infection and the bile duct had been out, would you be able to go in and identify both ends of it? A. Yes, if you cut the bile duct one end dries over and the other end drains a long while after. When it sloughs off the whole thing disappears. Q. If the doctor was unable to find the bile duct or the common duct, then what would that indicate, that it had been sloughed out through infection; or would it indicate to you it had been cut? A. I would rather infer it either sloughed off or else was covered over by the scar tissue; that it was stenosed, as we call it; a bile duct that is entirely accluded by scar.

"Q. . . . Assuming that Mr. Fritz drained bile while in the hospital and after going home, and that the drainage continued for some time and then healed up, and that he would get jaundiced, had fever and chills, and assuming that did occur after this operation, state whether or not that is a condition that occurs? A. Yes. We doctors have to take

conditions as we find them. When we operate on a case we do the best we can and take things as they are. If they become infected, we don't put the infection in there, and then we have to deal with that the best we can. If that had not been infected, he most probably would have been perfectly all right. On the other hand we can only—surgery of the gall bladder is a very ticklish affair for this reason: There isn't a part in the body that has as many variations as the gall bladder region, and it is difficult, sometimes. There will be an extra tube here and another tube there, and we have to do the best we can as to what we find. We don't put infection in the wound. Infection comes from the wound, as I think the infection came from that man's infected bile.

"Bile comes out from the liver diseased, and that usually clears up in a few days. The cystic duct that you tie up, connecting the liver, may slough off and he will drain for weeks. Sometimes there is such an enormous infection that everything sloughs out. . . .

"Q. You mentioned the temperature the first day of the operation, and I don't believe I asked you fully about that. Will you explain the significance of that to the jury? A. He had a very high temperature just following the operation, which usually means a very severe infection; and that, coupled with the fact that his abdomen was swollen, means of course that the infection comes from something that involves the abdomen and usually it came from infected bile. This man is draining bile, and as soon as you expose the abdomen to the infected bile you get a high temperature. The high temperature means the patient's resistance to the infection. A high temperature and high white count is the sign, usually, of pus infection. Q. The quick onset of that temperature indicated that the bile had been infected before the operation. Is that right? A. That is right."

Dr. Roscoe E. Mosiman testified on behalf of appellant. Dr. Mosiman is a graduate of the Johns Hopkins Medical School and has practiced in Seattle since the first world war. He does the pathology surgery at the Seattle General hospital.

A long, hypothetical question was propounded to Dr. Mosiman which included a full description of respondent's physical condition prior to the operation, as indicated by re-

spondent's history and the examination made by appellant. He was then asked:

"I will ask you if in your opinion as a physician, exercising the degree of general care and diagnosis that would be exercised by physicians ordinarily, skilled physicians using ordinary care in this vicinity, would be justified in operating for gall-bladder trouble and appendix trouble. A. Yes, decidedly."

The record then disclosed the following evidence:

"Q. I mean, would there be—could a patient have infected bile even before an operation? A. Oh, yes. You see a lot get an infection. Very few will have the chills before the operation. That is, the infected bile may be very low in quantity. If the patient runs a fairly quiet sort of temperature and not too much distress or chills or fever, his bile may be moderately affected over long periods of time. Q. And would that infection tend to progress or stay constant? A. Well, that depends on a great many factors; depends on the recentness of the infection and the type of infection and the vigorousness of the organism that is involved. . . . Q. Can you give us a short description of the structure of the liver and the bile ducts? A. Well, the liver is made up of liver cells, of units, and each liver cell is connected by a tiny capillary to a large tube, which is tributary to the liver, gradually enlarges to form this large gray structure coming out of the lower part of the liver.

"Now it is estimated that there is about half a million capillaries, bile capillaries, in the liver there—about half a million. Now, that shows how thin-walled they are and how little pressure, back pressure, it takes to push bile back through these little capillaries into the general circulation of the liver; and these little capillaries are, as I said, very thin-walled and they carry the bile from the liver cell which makes the bile into the large tributary, and then finally again carry down into the hepatic duct, the right and left hepatic ducts, and from there into the common duct and from the common duct it goes through a little opening into the duodenum.

"The pressure of this whole system is rather low. It is only a few millimeters in weight. It has a low pressure. Therefore any pressure, whether the pressure is applied right at the opening of the little place where it enters the duodenum, whether the pressure is applied along the course of the duct or whether the pressure is applied on the liver

itself, jaundice can develop because jaundice is the result of back pressure on these capillaries against the bile cells, so that after the bile cells make the bile, the bile can't go the normal way and has to go back."

The witness was then asked another hypothetical question which contained the history of respondent up to the second operation on August 3rd, and was asked: ". . . what would you say as to the role of infection on that condition?" His answer was:

"That certainly could be explained on the basis of a varying amount of infection in the liver itself and in the surrounding tissues of the liver, that there were periods of freedom from jaundice, and that persists when he would have chills and fever, these chills and fever were either due to infection within the liver substance itself or outside of the liver adjacent to the tubes."

The doctor concluded that respondent's condition present when he went to the Mayo clinic was caused by infection. The doctor's (Dr. Mosiman's) interesting and instructive reasoning and conclusions are too long to place in this opinion. His evidence demonstrated without doubt that respondent's condition following the operation had been due to infection and not to any mistake or carelessness on the part of appellant.

Dr. Homer D. Dudley is a graduate of Northwestern university and has practiced in Minnesota, Illinois, Old Mexico, and Seattle. He is a member of the staff of the King county hospital, Swedish hospital, and the Doctors' new hospital. He stated that ninety-five per cent of his practice was surgical. In answer to the same question propounded to Dr. Jacobson, he stated: "I would say these are symptoms of infection of the gall bladder which would justify an operation." He was of the opinion that the condition of respondent after the operation was caused by an infection. He stated that it was proper to allow respondent to leave the hospital after his first operation. The doctor (Dr. Dudley) was asked the cause of the condition found by Dr. Counseller, and he testified that it was caused by extreme infection.

Dr. Edwin Bannick, a graduate of the University of Iowa Medical College, had spent some time in the Mayo clinic and practiced medicine in Seattle for twenty-five years. He was called by respondent and stated that he did not do surgery but practiced internal medicine. The doctor testified that he had prescribed for respondent after respondent's return from Mayo's.

Dr. Bannick was asked if it was probable that the condition surrounding respondent after his first operation was due to injury of the common duct. He answered:

"Yes. The question is rather difficult. I think it is possible but not probable, but if I may amplify a little further, the occasion for a justifiable delay in observing these symptoms is the difficulty that one encounters in being certain whether this obstruction to the common duct is actually an injury to the common duct, or whether it can be due to a stone which has come down either subsequent to the operation or as a result of stoppage of the bile, and so on, so that occasionally after prolonged observation and drainage the condition does remedy itself.

"If the duct is actually strictured, then of course it is very unlikely it would remedy itself. The occasion for justifiable delay is to be sure that the obstruction is due to an actual stricture. . . .

"Sometimes there is actually a sharp stricture with dilatation in some portions of it. In other cases the whole duct is actually strictured so that it is nearly thread-like; but I think there is no uniformity, depending entirely on which level of the duct the injury has occurred and what attempt nature has made to repair it.

"It would present a variable picture, the point being, from a physiological standpoint, in every case, you assuming there was a stricture, that the normal passage is interfered with, narrowed or obstructed completely, as the case may be."

Dr. Bannick further stated that in such cases an exploratory operation would be advisable. He also testified:

"Q. Would it be possible for a subsequent infection to absorb or cause the common duct to disappear more readily than if the common duct were cut and just left there? Is that an involved question? A. No, I think that is right. I think he had what we have referred to frequently as a bile

peritonitis and going back up in that area. Bile is an irritant substance, and being an irritant substance it does a lot of damage. I think that would be possible. . . . Q. Is it true that in such conditions, such as the infection around the liver or bile ducts that the stitches or sutures, I think you call them, themselves could be digested, you might say, prematurely by the leukocytes? A. Yes, sir."

Dr. Clement I. Krantz, who graduated from Johns Hopkins Medical School and later taught in the Harvard Medical School, was called by respondent. He was asked:

". . . while the surgical wound was open, a column of packed gauze, in a pussy and foul condition, came out of the surgical wound, would that gauze in the surgical wound have any effect upon that patient? . . . Would the presence of such a substance in the surgical wound have any effect upon the recovery of the patient? . . . A. Well, the placing of the gauze in an infected wound is a sound surgical procedure and to keep the wound open and draining, to let the material out, is a sound surgical measure. Q. To let the gauze out? A. The gauze will absorb the infected material; that is, the pus. Q. Is the keeping of infected gauze in a wound sound surgical procedure? . . . A. The gauze naturally becomes infected as soon as it is placed within the wound. To keep gauze sterile, one must have it in a sterile container; and, as I understand it, there was an infection present, and as soon as one introduces the gauze in an infected wound the gauze becomes infected, as well. . . .

"Q. Now then, under the condition where the surgical wound remained open, is it customary, in a surgical operation, for the surgeon to make a tract into the surgical wound through which the bile might come from someplace on the inside? A. In the first place, an operation has been performed and a contact down to where the bile comes from has already been made. I presume you mean after the operation has been completed and the wound sewed over and the surgeon then discovers that there is some bile in or below the area that has been sutured or sewed together. It would only be good surgical judgment to open the wound to allow this matter of bile to come forth."

The respondent states in his brief that his points are these: (1) That during the time respondent was in the hospital from March 9, to March 30, 1943, he had a condi-

tion of jaundice, chills, and fever; (2) that between March 1, and July 1, 1943, while at home, he had a continuous history of jaundice, chills, and fever. Further, that in the depositions taken of the appellant May 24, June 19, and July 14, 1944, appellant stated that no bile drain was run from the abdominal cavity of the wound; that appellant also stated that, as to the foreign substance which came out of the wound, "it was a lie"; (3) that, after the second operation on August 3, 1943, respondent had constant biliary trouble; and (4) respondent was in the hospital again for obstructive jaundice a week before the trial and was also in the hospital during a portion of the time the case was being tried.

It may be admitted that the facts as just related by respondent are present in this case. We cannot determine, however, that they prove negligence on the part of appellant.

Here we have a most interesting case, involving a charge of malpractice in the performance of a most difficult operation by a surgeon of many years' experience. We have been careful to describe at length the location of the gall bladder and explain by reference to medical books its connection with the liver, together with a description concerning the ducts leading from the liver and their connection with the gall bladder. This was done in order that the reader of this opinion might have a complete picture of the problems confronting this court.

Appellant concedes in his brief that if he cut, strictured, bruised or otherwise injured the common bile duct in either operation he would be guilty of negligence. We are unable to find any evidence which even indicates that appellant in any way injured the common bile duct.

Appellant in his testimony clearly and with minute detail described every step of the operation for the benefit of the jury and the trial court. He distinctly stated that he had not injured the common duct. His method of operation and treatment was approved by eminent physicians and surgeons, including those called by respondent.

It is entirely clear that the intense pain suffered by respondent was caused by the disease which necessitated the operation. Before the operation respondent was a sick

man. He had been suffering from a diseased condition of the gall bladder, brought about by infected bile. The bile remained infected after the operation. It irritated the wound and the ducts and caused the many adhesions, which in turn brought about the unsatisfactory condition which caused respondent to believe that the operation had not been properly performed. There was no foreign substance left in respondent's abdomen by appellant. There was no foreign substance left in or near the wound except the gauze and other necessary dressings. Respondent's own witness, Dr. Bannick, was of the opinion that the placing of gauze in the wound and keeping it open and draining were sound surgical measures.

Some argument has been advanced by respondent to the effect that appellant's vision was affected. However, there is no evidence that the doctor had any loss of vision other than that which was supplied by his glasses.

The great mass of evidence supplied in this case does not prove negligence on the part of appellant. It does, on the other hand, prove that the appellant used great care in performing the operation and administering to his patient's needs after the operation. The evidence which we have set out proves the above statement much better than any reasoning or conclusions on our part.

Respondent has presented a motion which reads:

"In the event the motion for new trial is vacated, then respondent moves this court to permit the trial court to again pass upon a motion for new trial."

The motion is supported by affidavits from Dr. V. S. Counseller, dated April 25, 1945, Dr. Edwin Bannick, and respondent. Dr. Counseller stated in his affidavit that on December 15, 1943, he found that respondent was suffering "with biliary cirrhosis of the liver" and that biliary cirrhosis is due to mechanical interference with the main bile duct channel; that he performed an operation December 28, 1944, the purpose being to "free up the stump of the common hepatic duct," uniting this duct to the duodenum over a vitalium tube; that at the time of the last operation he was un-

able to find, after diligent search, any evidence of the common hepatic duct and found that respondent's convalescence was good.

Dr. Bannick stated that he treated respondent, beginning in June, 1944; that he was furnished an X-ray picture showing that a Sullivan tube had been inserted to connect the liver with the duodenum. He also stated that, assuming that the vitalium tube remains in position, respondent may make a "fine recovery."

The respondent in his affidavit stated that he has recovered his health so that he was able to join the Retail Salesman & Service Union and is drawing sixty dollars per week as wages. He also stated that he constantly has to be favored in his work on account of the tube which is now in his system and that all signs of jaundice, fever, and chills are absent.

In *Morrow v. Morrow,* 179 Wash. 329, 37 P. (2d) 692, this court in the following language laid down a rule which must govern those who apply for a new trial upon the grounds of newly discovered evidence:

"Heretofore, a motion was made by appellant to remand the case to the trial court for the purpose of passing upon alleged newly discovered evidence and to pass upon her petition to vacate the judgment. This motion was deferred to be heard when the appeal was submitted on the merits.

"After reading and considering the affidavits presented in support of this motion, we find that the motion is not well taken. The affidavits as to some of the proffered testimony show that the evidence would be merely cumulative and impeaching in character, as to which there was evidence introduced by appellant at the trial of the case. The affidavit of appellant and one of her present counsel do not allege that the other witnesses were not available, or that any attempt had been made to obtain their evidence previously.

"To justify the granting of such a motion, it must appear (1) that the evidence is such as will probably change the result if a new trial is granted; (2) that it has been discovered since the trial; (3) that it could not have been discovered before the trial by the exercise of due diligence; (4) that it is material to the issue; (5) that it is not merely cumulative or impeaching. *Libbee v. Handy,* 163 Wash. 410, 1 P. (2d) 312 (not cited by either party). To the same

effect are: *Peoples v. Puyallup*, 142 Wash. 247, 252 Pac. 685; *Eyak River Packing Co. v. Huglen*, 143 Wash. 229, 255 Pac. 123, 257 Pac. 638; *Pylate v. Hadman*, 151 Wash. 245, 275 Pac. 559; *White v. Donini*, 173 Wash. 34, 21 P. (2d) 265; *State v. Wynn*, 178 Wash 287, 34 P. (2d) 900."

 The affidavits of Dr. Bannick and respondent do not submit any newly discovered evidence which could have any bearing upon the issues presented here. Dr. Bannick's conclusion is based entirely upon an assumed condition, which cannot in any way affect the issues relative to the negligence of appellant.

Dr. Counseller simply adds to his testimony given at the trial and does not include any newly discovered evidence. Dr. Counseller, on direct examination, was asked about the condition of respondent's liver and testified that he graded it "2" and "if a patient has a complete obstruction he will have a much more diseased liver." He stated then that respondent had "biliary cirrhosis of the liver." Counsel for respondent did not then pursue his questions further relative to a cause of the condition of respondent's liver. Certainly a new trial cannot be granted because an attorney refuses or neglects to bring certain facts to the attention of the jury. Aside from that, the statement made by Dr. Counseller is only contradictory of that given by the other doctors in their testimony.

The motion is not well taken and is denied. The order of the trial court, granting a new trial, is reversed with instructions to dismiss the action.

MILLARD, STEINERT, ROBINSON, JEFFERS, MALLERY, and GRADY, JJ., concur.

BLAKE, J. (dissenting)—I think the evidence was sufficient not only to take the case to the jury, but to warrant a verdict for plaintiff. That was undoubtedly the view of the trial court else it would not have made a general order in granting a new trial.

BEALS, C. J. (dissenting)—The trial court entered a general order granting a new trial. In my opinion under our decisions this order should be affirmed.

I therefore dissent.

---

January 4, 1946. Petition for rehearing denied.

[1]Reported in 163 P. (2d) 133.