[No. 32484. Department One. February 11, 1954.]

WILL S. SMITH, *Appellant,* v. AMERICAN CYSTOSCOPE MAKERS, INC., *Defendant,* AMERICAN HOSPITAL SUPPLY COMPANY *et al., Respondents.*[1]

[1] Reported in 266 P. (2d) 792.

*Edmondson & Mullins*, for appellant.

*Cheney & Hutcheson* and *Lauren W. Dobbs*, for respondents American Hospital Supply Company and Pedersen.

*Gavin, Robinson & Kendrick*, for respondent Ross.

WEAVER, J.—The trial court sustained challenges to the legal sufficiency of the evidence and discharged the jury. Plaintiff appeals from a judgment dismissing his action with prejudice.

Appellant alleged damages for burns and a wrenched back suffered by him during a prostatic resection, an operation involving the removal of tissue from the prostate gland. The alleged damages resulted from electrical shocks caused by a short circuit in a Wappler Electro-Surgical Unit used for the operation. The unit was owned by the Yakima Valley Memorial Hospital.

Appellant sued (a) the American Cystoscope Makers,

Inc., the manufacturer of the electrical unit; (b) the American Hospital Supply Company, the vendor of the electrical unit; (c) Paul Pedersen, the salesman of the American Hospital Supply Company, who sold the machine to the hospital; and (d) William L. Ross, Jr., the surgeon performing the prostatic resection at the time the accident occurred. Prior to trial, the American Cystoscope Makers, Inc., was dismissed from the case for want of jurisdiction. No appeal has been taken from this dismissal. Throughout the proceedings, the American Hospital Supply Company has preserved a special appearance, claiming that it is not doing business within the state of Washington, and that service of process upon defendant Pedersen, its salesman, is ineffectual to subject it to jurisdiction of our court.

Our study of this case was made more difficult by reason of appellant's failure to comply with Rule on Appeal 42(6), 34A Wn. (2d) 46. Appellant's brief contains not a single page reference to the statement of facts nor the transcript. See Rule on Appeal 7, 34A Wn. (2d) 18.

We bear in mind that respondents' challenge to the legal sufficiency of the evidence admits the truth of appellant's evidence and all inferences that reasonably can be drawn therefrom; and that we interpret the evidence in the light most favorable to appellant and most strongly against respondents. *Brucker v. Matsen,* 18 Wn. (2d) 375, 377, 139 P. (2d) 276 (1943).

Under this rule, the evidence discloses the following facts:

In the spring of 1950, defendant Pedersen, a salesman for the American Hospital Supply Company, solicited an order for a Wappler Electro-Surgical Unit from the Yakima Valley Memorial Hospital. The order was approved by the home office of the vendor, which was located outside the state of Washington. At the request of the vendor, the unit was shipped directly from the manufacturer in New York, to the hospital. It was unpacked, installed by a hospital employee, and placed in the operating room of the hospital in August, 1950. Shortly after delivery, defendant Pedersen testified that he gave the exterior of the cabinet a cursory

visual examination to determine whether it had been damaged in transit.

A Wappler Electro-Surgical Unit, in so far as we need describe it, is a portable metal cabinet, approximately two feet square. When connected with the electrical system of the hospital, it is capable of transforming the regular electrical current to a high frequency. The frequency may be controlled by dials on the cabinet.

Two other electrical cords connect to the cabinet. To one is attached the surgical instrument called the "resectoscope." It is described as a small tube having a bare wire loop extending from one end, and containing telescopic lenses, a light, and a water canal. By regulating a foot switch, the current passing to the wire loop can be adjusted to cut tissue or to stop bleeding by coagulating blood vessels. The other electrical cord, which is in evidence, is seventy-two inches long, one eighth inch in diameter, has metal male terminals, one to be plugged into the electrosurgical unit and the other to be plugged into a small receptacle located on the corner of a six-by-nine inch metallic plate. When the machine is in use, the plate is placed under the buttocks of the patient. The cord returns the current to the electrosurgical unit.

During the four months prior to the prostatic resection performed on appellant, the Wappler Unit had been used in fourteen or fifteen similar operations, without incident. December 6, 1950, appellant was taken to the surgery. He testified that Dr. Ross was reading a book which "said 'Instructions,' on the top." Called as a witness by appellant, Dr. Ross testified that he had practiced as a urologist for thirty years, had performed many prostate operations, owned two electrosurgical units of a similar character, and had used this particular machine for two previous operations.

Appellant was given a spinal anesthetic. He was placed on the operating table, with his legs over metal "knee crutches" attached to the table. He wore a surgical gown and was almost completely covered by surgical drapes.

Dr. Ross commenced the prostatic resection. In such an operation, the resectroscope is inserted into the bladder of the patient. By regulating the current and manipulating the bare wire loop, tumor tissue can be cut from the prostate gland.

The plaintiff testified that about fifteen minutes after Dr. Ross started to operate he received a violent electrical shock and was tossed around on the operating table; that at approximately fifteen minute intervals he received three more shocks; that after the second shock, the plate was removed from under his buttocks, rubbed with some material, replaced, and the operation continued; that plaintiff told the attending anesthetist that he felt something in his legs and that he felt that he was being burned; that he "could smell something. . . . It smelled like burning flesh, or something to that effect"; that he did not speak to Dr. Ross; that after the fourth shock, an adjustment was made to the machine; that Dr. Ross stood up each time appellant had an electrical shock. Thereafter, the operation was completed in about thirty minutes with no further trouble. The prostatic operation was a success.

After appellant was returned to his room, a third degree burn, the size of a silver dollar, was discovered on each of his thighs.

The Wappler Unit was used in other operations, without incident, following appellant's operation.

A subsequent examination of the unit revealed a small break in the wire which returned the current from the metal plate to the machine. This break was located *within* the small metal terminal. The break could be detected only by pulling the wire out of the terminal. Apparently, in certain positions, the cord did not return the electrical current to the machine. The current then grounded through appellant's thighs to the metal knee crutch supports, thus causing the burn.

Did the evidence establish a *prima facie* case (a) against Dr. Ross for malpractice; and (b) against the vendor and its agent for selling a defective machine?

Appellant argues that the evidence proves malpractice because

" . . . the doctor continued to use the machine after the first electrical short circuit, and caused the plaintiff to suffer three more shocks."

In addition, we infer from the facts, for the purpose of this decision, that Dr. Ross knew appellant received the shocks.

We have had occasion many times to state the rules of law applicable to malpractice in the field of medicine. See *Fritz v. Horsfall*, 24 Wn. (2d) 14, 163 P. (2d) 148 (1945), and cases cited. In *Cochran v. Harrison Memorial Hospital*, 42 Wn. (2d) 264, 267, 254 P. (2d) 752 (1953), we said:

"We have held that, before a physician or surgeon may be held liable for malpractice, he must have done something in the treatment of his patient which the recognized standard of medical practice in his community forbids in such cases, or he must have neglected to do something required by that standard. In order to sustain a judgment against a physician or surgeon, the standard of medical practice in the community must be shown, and, further, that-the doctor failed to follow the methods prescribed by that standard. Negligence on the part of the physician or surgeon by reason of his departure from the recognized standard of practice must be established by medical testimony. An exception to this rule is recognized where the negligence is so grossly apparent that a layman would have no difficulty in recognizing it. *Fritz v. Horsfall*, 24 Wn. (2d) 14, 163 P. (2d) 148, and cases cited; *Derr v. Bonney, supra*."

In the instant case, no medical testimony was presented to prove that the doctor failed to follow the standards of the profession in the community when the problem arose during the operation. No medical testimony was given of any possible alternative. Therefore, if the evidence establishes malpractice on the part of Dr. Ross, it must be under the exception to the rule, *i.e.*, that his negligence in continuing the operation was "so grossly apparent that a layman would have no difficulty in recognizing it." See *Nelson v. Murphy*, 42 Wn. (2d) 737, 258 P. (2d) 472 (1953). Of this phase of the case, the trial judge said in his oral opinion:

"The evidence shows, that if he [Dr. Ross] had stopped and sought to determine the cause of the injury, he wouldn't have found it, because it was a latent defect and not discovered for a long time thereafter.

"Therefore, it seems to me that the crux of the whole matter is this: Was the doctor negligent in not stopping, and in continuing in the use of this machine? I don't see how any layman could determine that fact, under the evidence which is adduced. The thought occurred to me, when the evidence was unfolded, as was aptly said in the argument, if he had stopped it might have caused his death, but I don't know. I don't know whether there was any negligence, or not, there is no guide, there is no criterion, before the Court and the jury by which it is able to determine whether there was negligence, unless a layman can say, without any other testimony at all, 'Yes, he was negligent in continuing with this operation, under the circumstances.' . . . I couldn't say that the doctor should have stopped, or that he should have continued. I don't think any reasonable man could say. . . . I think there is lacking in this case any criterion or standard by which it could be determined by a tryer of fact whether or not the doctor was negligent in continuing with the operation after he knew that there was something wrong, and after these shocks were found."

Would appellant's life or health have been endangered if Dr. Ross stopped the operation after the first shock occurred? Could the operation have been completed at the time by some other method, or completed later, without the possibility of complications?

These questions cannot be answered by a trier of the facts without the aid of medical testimony establishing the recognized standard of medical practice and procedure in the community, under the circumstances. The surgical procedure of a prostatic resection requires skill, judgment, learning, and experience far above the ordinary scope of a layman's knowledge. Thus, the exception to the rule cannot apply.

As a matter of law, there was not sufficient evidence to submit to the jury the alleged negligence of Dr. Ross. The trial court did not err when it dismissed the action against him.

The foregoing disposes of appellant's contention that the doctrine of *res ipsa loquitur* applies. *Nelson v. Murphy, supra.*

Next, we consider the challenge to the legal sufficiency of appellant's evidence by respondent American Hospital Supply Company, and of its salesman, Pedersen. We have not overlooked the fact that the American Hospital Supply Company has preserved a special appearance at all stages of these proceedings. However, in view of our conclusion, we assume, without deciding, that, for the purpose of this case, our courts have jurisdiction over this foreign corporation, to which we will hereafter refer as the vendor.

Appellant's claim to recovery against these respondents is upon the theory that they were negligent in three respects.

First, that they "carelessly and negligently represented said machine to be safe as aforesaid although they had no knowledge of whether it was safe or not." Second, that they knew, or should have known, in the exercise of due care "that said machine was in such condition that it was likely, upon use, to short its electrical current and cause injury to patients in connection with surgery being performed upon them." Third, that they were negligent when they did not inspect and check the Wappler Electro-Surgical Unit.

As to the first contention, appellant's evidence discloses that these respondents made no representation to the hospital concerning the unit. They did not manufacture it. The evidence shows that it is a standard piece of equipment, well known to the trade; that it was purchased under a trade name; that it had a good reputation in the performance of the duty for which it was designed.

Appellant's second and third grounds of negligence are governed by the rule set forth in Restatement, Torts, 1948 Supp., § 402:

"A vendor of a chattel manufactured by a third person, who neither knows nor has reason to know that it is, or is likely to be, dangerous, is not subject to liability for harm caused by the dangerous character or condition of the chat-

tel even though he could have discovered it by an inspection or test of the chattel before selling it. . . .

"*Comment*: *b*. There is a clear distinction between the liability of a manufacturer and that of a vendor for harm caused by a chattel made by the former and sold by the latter. The manufacturer of a dangerously defective chattel is the creator of something which is foreseeably dangerous when it is used for the purpose for which it is manufactured. The constructing of the chattel defectively, with knowledge it is to be sent out to be used, is an unreasonably dangerous activity. On the other hand, the vendor who reasonably believes that the chattel he is selling is safe for use is not, in selling and delivering the chattel, doing anything which is foreseeably likely to cause harm. The slight risk inherent in the possibility the chattel may be defective is not sufficient to constitute an unreasonable risk. The burden on the vendor of requiring him to inspect chattels he reasonably believes to be free from hidden danger outweighs the magnitude of the risk that a particular chattel may be dangerously defective (See §§ 291-293). Negligence is determined in the light of the facts known to the actor (See § 282, Comment g)."

In the instant case, appellant's evidence discloses that the defect in the electrical cord was a latent one, hidden from sight and knowledge, and one which could not have been discovered by the exercise of ordinary and reasonable care.

Finally, there is no evidence, nor can an inference be drawn from any evidence, that the defect existed at the time the unit was delivered to and installed in the hospital. The evidence shows affirmatively that it performed satisfactorily in fourteen or fifteen operations prior to the accident. Proof that the unit was defective when delivered to the hospital must be based upon evidence, not conjecture.

We agree with the trial court. Appellant's evidence and all reasonable inferences based thereon do not establish liability against the American Hospital Supply Company and its salesman, Carl Pedersen.

The judgment is affirmed.

GRADY, C. J., MALLERY, HILL, and OLSON, JJ., concur.