RUTH CORN, APPELLANT, v. JAMES B. FRENCH, RESPONDENT.

No. 3809

October 27, 1955.                    289 P.2d 173.

*Emilie N. Wanderer,* of Las Vegas, for Appellant.

*Morse, Graves & Compton,* of Las Vegas, for Respondent.

## OPINION

By the Court, BADT, J.:

Plaintiff sued defendant for the unauthorized and unnecessary amputation of her right breast, alleging that the operation was contrary to her desire and consent and without making an appropriate diagnosis to ascertain presence of malignancy therein, it appearing from a post-operation pathological analysis that there was no malignancy. After the plaintiff had completed the presentation of her evidence, the court granted a motion for involuntary dismissal on the ground that upon the facts and the law the plaintiff had failed to prove a sufficient case for the jury. Rule 41 (b) N.R.C.P.

Plaintiff has appealed from that judgment of dismissal. Although she assigns a number of errors claimed to be prejudicial and although numerous points are discussed by both parties, we feel that the issue is narrowed to the question whether the jury could have found from the evidence presented by the plaintiff and the inferences reasonably to be drawn therefrom (1) that defendant had performed the operation without her consent and contrary to her instructions, and (2) that the defendant had been negligent in failing to make a biopsy or obtain a pathological examination of the tissue from plaintiff's breast before proceeding with the radical operation. We conclude that on both of these issues there was sufficient evidence to go to the jury, and it was therefore error to grant the motion for involuntary dismissal.

(1) Plaintiff testified that on August 12, 1950 she had an appointment with defendant at the latter's office at Boulder City, Clark County, Nevada: "* * * We talked about the condition of my breast; that there were danger signals; and he examined me and it was my understanding that he would make a test of a lump under my breast to see if it was cancerous. * * * He didn't make X-rays or blood tests or anything like that, whatever tests you make. He did examine me with his hands, looked at my breast and examined me with his hands * * *. I asked him if he could make a test to see whether or not it was cancerous and he said he could and that he would. * * * and called the hospital later when I was dressed, and he said he was going to make sure that they would have a room reserved for us, myself and another patient he had in mind. * * * At that time that he was talking on the telephone, to the hospital, he was talking about preparing a tray. And he said 'for the removal of a right breast.' And I said 'If that's my breast you are talking about, you are not going to remove it. He said 'I have no intentions of removing your breast. I wouldn't think of doing so without first making a test.' He said 'It takes the same instruments to make a test as it does to remove one.' I

subsequently entered the hospital, the Rose De Lima, on the 14th of August * * * around 12:30 or 1:00. At that time I signed a consent." She then identified a document as the one which she had signed and which reads as follows: "I hereby give my consent to James B. French, M.D., to perform an operation for mastectomy and hemorrhoidectomy upon myself, and to do whatever may be deemed necessary in his judgment." It was witnessed by her husband and a hospital nurse. She testified further: "Up to that time that I signed that document I had never heard the word mastectomy that I know of. I did not know the term. * * * On the evening of the 14th I saw Dr. French at the hospital. One of the sisters in the hospital and Junelle Sherwood were also present. * * * I asked [the doctor] again to make sure that he understood he was just to make a test of the breast, and the hemorrhoidectomy. His answer was that he had no intentions of doing anything different; he was to make a test of the breast only. I remember that I just kept repeating it, and talking about it, and I did say to him that if he did go ahead and remove the breast that it could not be put back on, but if he didn't take it off, then we could make the test and it need not be taken off."

After the removal of her breast she testified to a subsequent conversation with Dr. French at the hospital and she understood him to say that she had had cancer but that he had removed it; that he had got it early and got every bit of it. "I said 'Are you sure you got it all' and he said 'yes,' and I said 'How long would it have been before it started to spread?' He said 'That I can't say, maybe two days, maybe a week.' He said it hadn't started to spread." She testified to a later conversation with the doctor at his office in Boulder City concerning some lumps on her ribs. "And I went to see if the cancer was spreading and he said that it could not be, because I didn't have cancer in the first place. That was the first time I was aware of the fact that the breast did not have cancer."

Junelle Sherwood testified that she was present at the hospital on August 14, 1950, and recalled the conversation between Mrs. Corn and Dr. French, in which she participated. She stated: "I asked [Dr. French] if he was going to make a test on Mrs. Corn before—test of her breast, and he said that he was, he always did in that case." She was unable to remember anything further, but on the following day she was recalled and testified: "Mrs. Corn asked Dr. French to be sure and just take a test, and not to remove her breast. He said that he would, that he always did."

Plaintiff's theory of this issue is, first, that when she signed the written consent to the operation she had never heard and did not know the meaning of the word mastectomy, and, secondly, that in any event she clearly and unmistakably made known to the defendant that he was just to make a test of the breast and that his answers showed that he completely understood such instructions; that the witness Junelle Sherwood substantially corroborated her testimony; that the jury had the right to believe this testimony and to determine that the operation was unauthorized. The trial court's reaction to this contention, when made in opposition to the motion to dismiss was as follows: "Now, if any person after signing that sort of consent, which is general in its terms as well as specific, could repudiate it after an operation, there wouldn't be any doctor in the country that would be safe from suits of this sort. She, whether or not she understood the meaning of it, by her action in giving a general consent, is estopped from denying that she gave her consent to the very operation that was performed." Plaintiff's contention however is not that she had a right to *repudiate* her consent but that, even assuming that she signed the written consent with full knowledge of its meaning, she was not precluded from canceling or withdrawing it before the operation. Such right is not seriously denied by defendant. We gather

that the court completely discredited the testimony of the plaintiff and her witness. Whatever right the court might have had to do this on a motion for new trial or under other possible circumstances, the rule is clear on motion for involuntary dismissal that the motion admits the truth of plaintiff's evidence and all inferences that reasonably can be drawn therefrom and that the evidence must be interpreted in the light most favorable to plaintiff and most strongly against defendant. 70 C.J.S. 1010, Physicians and Surgeons, sec. 63, Questions of Law and Fact, Valdez v. Percy, 35 Cal.App.2d 485, 96 P.2d 142. The issue of whether the plaintiff had withdrawn her consent should have gone to the jury.

(2) In any event, as "the consent did not foreclose inquiry into negligent conduct in determining the advisability and necessity for the operation," Valdez v. Percy, 35 Cal.2d 338, 217 P.2d 422, 425, we turn next to the question as to whether there was sufficient evidence to go to the jury on the question of the defendant's alleged negligence in failing to make a biopsy or to have a pathological analysis of the breast tissue made as an aid to his diagnosis before performing the radical operation. The reaction of the learned trial judge to this was as follows: "The testimony of Dr. Hemington, the plaintiff's own witness, was to the effect that he would have done the same thing under the same circumstances. That is, remove the breast without biopsy. And plaintiff, of course, is bound by that testimony and could not impeach that testimony by calling in some other doctor.

"It seems to me that no thought of bringing this suit ever arose until the pathologist's report showed that what had been taken from Mrs. Corn wasn't malignant, and when that proved to be the case why she thought that possibly she would still be alive today if her breast had not been removed, and it was unnecessary to remove it.

"But lots of times, as stated before, hindsight is better

than foresight. There is nothing to show that Dr. French didn't use expert judgment at the time of the operation, and did what he or any other doctor would have done under the same or similar circumstances. There was no conflict in the evidence sufficient for the jury to decide any question of fact, and, consequently, the Court must take this case from [the jury] and dismiss the action."

Respondent's position is stated by him as follows: "The cases indicate that the law does not hold a physician or surgeon liable for malpractice for every unfortunate result which may occur in medical practice. Such physician is required to possess only that degree of learning and skill ordinarily possessed by practitioners of the medical profession in the same locality, and he need but exercise ordinary care in applying such learning and skill to the treatment of his patient. No higher degree of responsibility is imposed in making a diagnosis than in prescribing treatment. Whether a doctor does or does not possess or exercise the requisite skill or learning in a particular case is generally a question for experts and can be established only by their testimony, and such expert evidence is conclusive where the matter in issue is one within the knowledge of experts only and not within the common knowledge of laymen." In support of this statement respondent cites: Huffman v. Lindquist, 37 Cal.2d 465, 234 P.2d 34, 29 A.L.R.2d 485; Worster v. Caylor, 231 Ind.625, 110 N.E.2d 337; Rodgers v. Lawson, 83 U.S.App.D.C. 281, 170 F.2d 157; Smith v. American Cystoscope Makers, Inc., 44 Wash.2d 202, 266 P.2d 792; Bugg v. Security Ben. Ass'n., 153 Kan. 522, 112 P.2d 73; Costa v. Regents of Univ. of California, 116 Cal.App.2d 445, 254 P.2d 85. These cases do not require discussion. On the whole they support the statement made. But the final statement that the expert evidence is conclusive *where the matter in issue is one within the knowledge of experts only and not within the common knowledge of laymen,* begs the question, and leaves unanswered the main question presented to us.

That negligence may exist in diagnosis, as well as in treatment has often been recognized and, as a proposition of law, requires no discussion. Lawless v. Calaway, 24 Cal.2d 81, 147 P.2d 604, and the cases therein cited.

Plaintiff called Dr. David Hemington as an expert witness. There was much testimony of a highly technical nature and many unsuccessful attempts to frame a hypothetical question which the court would permit. Finally, however, the witness stated: "If the permission for operation was signed as it is here, then I would have felt if I were doing the surgery, that I had the option of using my best judgment in a case with all of these conditions as stated in this record. I feel that I would have done the same as Dr. French. I would have done a complete mastectomy at the time." Plaintiff's counsel, claiming surprise, attempted to impeach this testimony by confronting Dr. Hemington with his testimony at a former trial. Defendant objected and the court ruled: "I don't think that there is any surprise. You knew the attitude of Dr. Hemington. He was a hostile witness more or less to start with, and I can't see any surprise in this case. Call the jury back. I won't allow you to impeach him." Finally he testified as follows: "The ordinary practice at that time, inasmuch as we had no pathologist * * * was, of course, determined, first, by the history, the physical examination, and the findings at operation. Now, ordinarily, in a case such as this, a biopsy would have been done, but if the circumstances at the time of the operation right in the operating room of which I know nothing, warranted, and if the consent is as it was signed, then I believe the doctor was warranted in removing the breast, without biopsy."

As to his familiarity with the standard practice in the community in the diagnosis and treatment of diseases of the breast (in 1950 when there was no resident pathologist there) Dr. Hemington had some difficulty in his analysis. He said: "I am embarrassed to a certain extent

because standards are peculiar things. However, with the commonly accepted methods, I am familiar, yes." Counsel tried to reconcile the witness's use of the terms "standard" and "commonly accepted methods." The witness then agreed with the court's interposition of its understanding of the situation in the following words: "I imagine that there are all classes of doctors here. Some of them have one standard and some have the other, and some doctors frown on the practice of certain doctors; and maybe the majority of doctors are inferior doctors, and that could be classed as a standard. But I think what this doctor in the preliminary question testified to was that he knew what the ordinary recognized course of procedure was." Later Dr. Hemington showed his further impatience with any attempt to define standards. He said: "Well, the so-called standards that you fellows are talking about, in my opinion, don't exist * * *." He testified that for many, many years (before a pathologist was present in Las Vegas after August, 1950) it was the practice to submit biopsies from the breast to a pathologist in California or elsewhere for a report. He said: "We have done that routinely," and that this had been the only method whereby a report could be obtained for the pathological study (that is, the determination of what disease is present) of the tissue submitted. However, when asked if that had been "the standard practice," he said, "I object to the 'standard.' I refuse to answer that." He stated however that he had still submitted his pathological studies to pathologists outside of the area even after there was a pathologist in that area.

Plaintiff called the defendant, Dr. French, as an adverse witness. There was already in the record the fact that the postoperation pathological report (following the operation of August 15, 1950) showed that there was no malignant tissue in the removed breast. We turn to Dr. French's testimony. It was his original provisional diagnosis that Mrs. Corn had carcinoma of the right breast. "Q. Was it your opinion at the time,

although not expressed on this record, that Mrs. Corn had cancer of the breast? A. That was my provisional diagnosis as expressed by the record, and it was also my opinion. Q. Was it your opinion as you operated upon the breast of Mrs. Corn? A. It was my opinion during surgery. Q. Were you able to tell to what extent the cancer had developed, if it was there? A. Yes, I feel like I could, except that you cannot—it is impossible to determine the spread of cancer by the naked eye, or by examination of a piece of tissue or a body, you cannot tell from what might be microscopic in a blood stream. You have a rough idea as to whether it is infiltrating rapidly into any other area or not. Q. Did you reach that conclusion concerning this at the time you were performing the operation on Mrs. Corn? A. My conclusion was that were this cancer of the breast, which I felt it was, that in all probability it had been entirely removed, and the patient would be cured and well. Q. Doctor, is it standard procedure where there is fear of or the inability to eliminate the possibility of cancer in the tissue of the breast, is it standard procedure to perform a radical mastectomy and by that eliminate also the axilla glands, the muscles going up into the arm? A. No, that is not a standard procedure. Q. Where there is some reason or probability of cancer being present in the breast, and it is not by way of biopsy determined how extensive that cancer may be? A. We determine whether to do what we call a simple mastectomy by removing the breast, or a radical mastectomy, taking off of the muscles of the shoulder girdle and up into the axilla, rests entirely with the surgeon at the time of operation. Q. Doctor, this operation was performed, I presume, to remove cancer, is that correct? A. That was my provisional diagnosis, and that is the reason that the mastectomy was done. Q. Your conclusion, doctor, was that it was chronic cystic mastitis? A. A form of chronic cystic mastitis. Q. Isn't it true that chronic cystic mastitis and carcinoma are inconsistent terms medically? A. Yes. Q. So that your provisional or your first idea of

what Mrs. Corn had is inconsistent with your conclusion, is that right? A. No, I would not state that. Q. Isn't that what we must conclude from your previous statement? A. No, that is not right. In the first place, you have asked me only about the adenocystic disease that Mrs. Corn had, and nothing concerning the bleeding from the nipple or the cystic tumor which was attached to the chest wall. We are dealing with three problems in this particular case. * * * The entire breast was involved with small bloody tumors and masses." Dr. French proceeded to testify, in answer to questions from plaintiff's counsel, as to the incidence of breast cancer in patients affected by chronic cystic mastitis as about 4.9 percent, that according to sundry pathologists named by him it varied from that figure to 20 percent. He also testified that approximately 60 or 65 percent of the tumors attached to the chest wall are malignant and that the possibility of a cure is considerably less than if it is lying free in the breast. He explained however that this did not apply to the plaintiff's breast, which exhibited the additional conditions described above. In answer to a question, Dr. French answered: "The operative report indicates that the incision was to remove the breast, and that the initial incision was made with that in mind." He had no independent recollection of making any initial preliminary incision. "The intention was to remove the breast, and I assume that the incision that I made was to remove the breast."

The record does not indicate that plaintiff was advised at any time by defendant that what he said was the "standard procedure" in the area, was to perform a radical mastectomy without a determination of malignancy through a biopsy, or that there was no pathologist in the area by whom a pathological analysis of the tissue might be made.

The foregoing lengthy recital of the evidence has been necessary in order to present the problem confronting us. There is no definite or specific expert testimony to

the effect that the defendant did not possess the degree of learning and skill ordinarily possessed by practitioners of the medical profession in the same locality, or that he did not exercise ordinary care in applying such learning and skill in the diagnosis of the plaintiff's ailment as cancer of the breast without a biopsy, or that standard practice required him to disclose to his patient the fact that no local pathologist was available and the fact that if in his judgment during surgery it seemed advisable he would perform a radical mastectomy without submitting any of the breast tissue to an outside pathologist for examination and report. Absent such expert testimony should the issue of negligence in the diagnosis have gone to the jury? We have concluded that it should.

Counsel have referred us to no case, nor has our independent research brought any to light, in which any court has been called upon to determine the question whether, without expert medical testimony, a jury might, from its own common knowledge and experience, recognize the use of the biopsy or pathological examination and the microscopic analysis of tissue as common and accepted diagnostic practice in determining the presence or absence of cancer. We find numerous examples of cases in which under varying conditions expert testimony was considered unnecessary. See annotation 141 A.L.R. 5. As observed by the court in Burris v. Titzell, 189 Iowa 1322, 177 N.W. 557, 562, 179 N.W. 851: "[C]ases do arise where common knowledge of physical facts and of the natural laws that govern physical life are so well known that a jury, from the facts before it, is able to determine, and correctly, whether the treatment was proper or not." It was likewise noted in Wharton v. Long, 18 Ohio L. Abs. 147, "that expert testimony is not always required to enable a jury to determine whether a physician has been guilty of negligence or malpractice, and this is particularly so where the conduct of or treatment administered by the physician is of such a character as to warrant the inference of want of

care or negligence in the light of the knowledge and experience of the jurors themselves as ordinary laymen." These expressions are typical of many found in the cases, although there is no pretension that these or any of such cases are factually in point. However a large class of cases, which we may refer to as the X-ray cases, we believe to be in all respects analogous, although the X-ray may have a longer history of use than the biopsy.

In Reynolds v. Struble, 128 Cal.App. 716, 18 P.2d 690, 694, a verdict for the plaintiff was sustained, the appellate court holding that he was the "victim of an unskilled diagnosis" in that the defendant physician had misread an X-ray. The court said: "Indeed, it might be almost said that the use of the X-ray as an aid to diagnosis, in cases of fracture or other indicated cases, is a matter of common knowledge. Even the layman, when injured, of his own accord seeks the X-ray. And under the rule of Jacobson v. Massachusetts, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643, 3 Ann.Cas. 765, the court could, in the absence of testimony, take judicial notice of this scientific advancement." This was in 1933. Not only did the Supreme Court of California deny a rehearing in that case but it quoted the language appearing above in the later case of McBride v. Saylin, 6 Cal.2d 134, 56 P.2d 941. There a judgment of nonsuit was entered but reversed on appeal. The defendant physician was sued for alleged malpractice in the treatment of an eye injury. A piece of steel had been lodged in the eye but was not discovered by the defendant, although the use of the X-ray would readily have shown its presence. We frankly concede the important difference of the facts in that case, as there was expert evidence to the effect that the X-ray and the opthalmoscope were the customary means used to determine the presence or absence of a foreign body in the eye. Our reference is for the purpose of calling attention to the court's emphasis of the use of the X-ray as an aid to diagnosis as a matter of common knowledge. In 1904 the Supreme Court of the United

States in Jacobson v. Massachusetts, 197 U.S. 11, 25 S.Ct. 358, 365, 49 L.Ed. 643, 3 Ann.Cas. 765, held that in the absence of testimony the court could take judicial notice of the efficacy of vaccination as a prevention of smallpox. The main question before the court was whether the Massachusetts compulsory vaccination statute was in violation of constitutional limitations. Mr. Justice Harlan quoted with approval the language of the New York Court of Appeals, Viemester v. White, 179 N.Y. 235, 72 N.E. 97, 70 L.R.A. 796: " 'A common belief, like common knowledge, does not require evidence to establish its existence, but may be acted upon without proof by the legislature and the courts.' " Speaking for the majority of the United States Supreme Court, Mr. Justice Harlan said: "What everybody knows the court must know, and therefore the state court judicially knew, as this court knows, that [the theory of vaccination as a prevention of the spread of smallpox] accords with the common belief, and is maintained by high medical authority."

In Agnew v. City of Los Angeles, 82 Cal.App.2d 616, 186 P.2d 450, 451, the trial court had granted a motion for nonsuit and the reviewing court, following the general rule, considered the evidence in the light most favorable to plaintiff. Plaintiff was suffering great pain as the result of a fall and a possible fracture was indicated. Subsequent X-rays showed that plaintiff's hip was broken. Nonsuit had been granted because there was no expert testimony that defendant had failed to use that degree of skill and learning ordinarily possessed by physicians of good standing practicing in the community where he resided. The facts testified to by plaintiff showed her fall, her great pain, her several consultations of the defendant and the defendant's persistence in his diagnosis that she was suffering only from a bruise. The court held that such facts (recited in greater detail in the opinion), if believed, would make a prima facie case in plaintiff's favor requiring denial of the

motion for nonsuit. The court recognized the general rule. "The law requires that a physician shall have that degree of skill and learning ordinarily possessed by physicians of good standing practicing in the same locality, and that he shall use the same care and diligence in applying that learning to the treatment of a patient. It is likewise the general rule that whether he has done so in a particular case is a question for experts and can be established only by their testimony." Citing Reynolds v. Struble, supra, McBride v. Saylin, supra, and other California cases, the court, in the following language, noted the existence of the general and specific exceptions to that rule. *"General Exception.* To the above general rule there is this well recognized exception, to wit, where the question of the propriety of the treatment is a matter of common knowledge of laymen, expert testimony is unnecessary in order to establish liability in a malpractice case.

*"Specific Exception.* The use of the X-ray as an aid to diagnosis in cases of fracture or other indicated cases is a matter of common knowledge, and the failure to make use thereof in such a case amounts to a failure to use that degree of care and diligence ordinarily used by physicians of good standing practicing in this community. The court in the absence of expert testimony may take judicial notice of this fact." The court concluded that when plaintiff fell, a possible fracture was indicated; that it was a matter of common knowledge of which the trial court should have taken judicial notice that an ordinary physician of good standing in the community in the exercise of ordinary care and diligence would have had X-ray pictures taken; that in failing to do so defendant "did not exercise the degree of learning and skill ordinarily possessed by physicians of good standing practicing in this community"; that the defendant thus failed to use ordinary care and diligence in his treatment of the plaintiff. See also Kimble v. Roeder, 115 Neb. 589, 214 N.W. 1; Howell v. Jackson, 65 Ga.

App. 422, 16 S.E.2d 45; Casenburg v. Lewis, 163 Tenn. 163, 40 S.W.2d 1038; In re Johnson's Estate, 145 Neb. 333, 16 N.W.2d 504; Valdez v. Percy, 35 Cal.App.2d 485, 96 P.2d 142, 35 Cal.2d 338, 217 P.2d 422; Lawless v. Calaway, 24 Cal.2d 81, 147 P.2d 604.

In the instant appeal from the judgment based upon the order granting the motion to dismiss, we are not called upon to determine whether or not defendant, in removing plaintiff's breast as the result of his original provisional diagnosis and without any pathological examination, failed to use ordinary care and diligence, but rather whether the evidence presented was sufficient to have justified a finding, or a necessary inference from the facts, to such effect, by a jury.

For over two generations pathologists and other medical men have been writing treatises on the pathological analysis of tissues for the diagnosis of cancer, and general practitioners have been sending their patients with symptoms of the disease to specialists. "What everybody knows the court must know." And this knowledge might well permit a jury to peer beneath the cloak of protection thrown about the defendant by the testimony that his diagnosis and treatment were in accordance with the standards of the profession in his community. This observation becomes stronger when we consider the testimony of Dr. Hemington, quoted above, concerning those standards.[1]

In Wiley v. Wharton, 68 Ohio App. 345, 41 N.E.2d

---

[1] It may be noted too that Dr. Hemington's language approving the removal of the breast without biopsy was at best equivocal. His approval was based upon the combination of two circumstances, the patient's consent and "the circumstances at the time of the operation right in the operating room of which I know nothing." The only circumstance that appeared in the operating room which was not previously known to the defendant was that the entire breast was involved with small bloody tumors and masses. But the jury could well have deduced from the defendant's testimony that this condition did not appear until he had already made his incision for the removal of the breast, and so could not have been one of the factors inducing such removal.

255, digested in Anno. 141 A.L.R. 24, it was held even in absence of expert testimony that the facts while not permitting the doctrine of res ipsa loquitur were sufficient to call for explanation. So here we feel that the jury may well have reached the conclusion that the facts called for explanation. It is true that the defendant physician, called as an adverse witness, testified fully as to his diagnosis and treatment and that Dr. Hemington, called by the plaintiff, but characterized by the trial court as a hostile witness, did come forward with an "explanation" that the ordinary diagnostic procedure of biopsy was not followed because there was no local pathologist in the county. This might well serve to explain why no biopsy was secured during the operation proper, preliminary to the mastectomy. It would not explain absence of a preliminary or independent pathological examination. There was no evidence that an emergency existed and no explanation as to why a specimen could not have been sent to an outside pathologist or the patient referred to another city for treatment where these services were available,[2] or why she was not at least advised that defendant intended to make a diagnosis without the assistance of a biopsy or pathological examination, or why she was not advised of Clark County's lack of such facilities and the availability to her of these facilities in some other city that could be readily reached by air transportation within the course of a couple of hours. At this stage in the proceedings (before the defendant had made a presentation of his defense) the absence of such explanation is readily understandable. We may not, however, anticipate that it would eventually have been given or that if given it would unquestionably have served to satisfy the jury.

The upshot of our discussion of this issue is that we are convinced, first, that the jury's consideration of the

[2] Reno, Los Angeles, San Francisco, Palo Alto, Salt Lake City—to name just a few. Here it should be noted again that the office examination was made August 12, 1950 and the operation performed August 15, 1950.

use of (or the failure to make use of) the pathological analysis of the tissue, in a proper case, for the purpose of diagnosis, must take its place beside the jury's consideration of the use of (or the failure to make use of) the X-ray in a proper case, and, secondly, that a jury has a right to take this into consideration in its own common knowledge and experience and without the assistance of expert testimony—the knowledge, concisely expressed, that "[m]icroscopic diagnosis is the *sine qua non* of neoplastic disease. It is the only means of absolutely establishing the true nature of the disease."[3]

For the reasons given, we conclude that the order granting the motion for involuntary dismissal was error, and that the judgment must be reversed and the case remanded for a new trial.

Reversed and remanded with costs to appellant.

MERRILL, C. J., and EATHER, J., concur.

---

[3]Lester Adelson. M.D., in "Physician in the Courtroom" (The Press of Western Reserve Univ., 1954).