**Bud MOON and Olga Moon, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. CIV–R–79–216–ECR.**

United States District Court, D. Nevada.

March 31, 1981.

Alfred H. Osborne, Echeverria & Osborne, Chartered, Reno, Nev., for plaintiffs.

Shirley Smith, Asst. U. S. Atty., Reno, Nev., for defendant.

## MEMORANDUM DECISION

EDWARD C. REED, Jr., District Judge.

Bud and Olga Moon (the Moons) have brought this action against the United States under the Federal Tort Claims Act 28 U.S.C. §§ 1346(b), 2671, *et seq.* (FTCA), on account of the death of their son, Bradley Moon (Bradley). According to FTCA, tort liability is determined by the law of the state where the act or omission complained of occurred. 28 U.S.C. §§ 1346(b), 2674. *See generally, Southern Pacific Transportation Company v. United States*, 462 F.Supp. 1193 (D.Cal.1978).

FTCA provides that the United States " . . . shall be liable in the same manner . . . as a private individual under like circumstances . . . " *Id.* The applicable state stat-ute is contained in NRS 41.080–41.090,[1] the Wrongful Death Act of the State of Nevada in effect at the time of this occurrence, which permits the heirs of a deceased to recover damages resulting from his wrongful death.

Bradley was a patient of the psychiatric unit of the Reno Veterans Administration Hospital at the time of his death. He had been on an outing with other patients and hospital staff members at Virginia Lake in Reno. Near the end of the day's activities Bradley suddenly bolted from the group of patients and ran away. Later he was seen to dive gracefully into the lake, to be swimming playfully and strongly about in the lake, and to disappear beneath the surface of the water. Subsequently he was found drowned in the lake.

The question is whether the subject employees of the Government were negligent under Nevada law in their actions or failure to act, during the period leading up to and at the time of these tragic occurrences.

Bradley was a fine young man, the youngest of a close-knit family unit consisting of his mother and father (plaintiffs herein) and his six sisters. The family, and indeed the community, were much saddened by Bradley's passing. Since he was the youngest child and only son, the family had high hopes and expectations for his future. He emulated and wished to follow in the footsteps of his father to achieve his level of success and popularity in the community.

Bradley was an outstanding student and athlete in high school, playing on the outstanding teams of Wooster High School in Reno which spawned Glen Carano now of the Dallas Cowboys. Bradley was well liked and popular with his classmates.

It appears that during his senior year in high school Bradley began to encounter some difficulties. He missed attendance at school and began to experiment with marijuana. His school grades declined and his family became justly concerned. A psychologist, Dr. Robert Whittemore, was con-

---

1. It has been contended that NRS 41.085 is an applicable statute on which to base recovery in this case. Whichever of the statutory schemes is used, however, will not affect the disposition of this case.

sulted. Subsequently, Bradley made a decision to drop out of high school and in his father's tradition enlist in the U. S. Marine Corps, hoping to escape from the deteriorating environment with which he had become involved. He successfully completed boot camp training in the summer of 1974, but at or about that time obviously became mentally ill.

On July 28, 1974, because of his mental difficulties, Bradley was discharged from the Marine Corps. For a period of several years after that he was in and out of Veterans Administration mental hospitals, culminating in his final admission to the Reno hospital in 1978. During that interim period Bradley suffered various periods of illness and also periods of remission and apparent recovery when he was able to reside with his parents in their home in Reno. At or about the time of his discharge from the Marine Corps he was rated 100% disabled and this rating continued (with consequent disability benefits being paid to him by the Government on account of his service-connected disability) until the time shortly before or about the time of his final hospitalization.

In the summer of 1978, Bradley seemed to be getting along fairly well, although he was by no means fully recovered. Then problems began to accumulate for him. His father, who was very close to him and who had previously suffered the amputation of a leg as a result of a car accident, was required to have serious heart surgery. Also, Bradley was required to be examined by Dr. Donald Molde in behalf of the Veterans Administration to determine if the 100% disability rating should be continued. While apparently there was no formal indication of a reduction in the rating prior to the time Bradley entered the hospital in September of 1978, there is some indication that Bradley realized his rating might be substantially decreased diminishing his disability benefits. While it is unclear as to whether the rating was ever actually decreased, it does appear that it was likely, as a result of Dr. Molde's examination, the rating would have been decreased from 100% disability to 50% disability.

These things welled up within Bradley. Both Bradley and his mother had had considerable experience with his past illnesses. They recognized distressing symptoms and his mother took him to the Veterans Administration hospital in Reno where he was admitted on a voluntary basis as an in-patient on September 15, 1978.

The admitting physician was Dr. Donald Hopps, who has since that time, for other reasons, terminated his employment with the Veterans Administration. Dr. Hopps had treated Bradley both as an out-patient at the Reno hospital and previously as a physician at the Veterans Administration Hospital at Palo Alto, California, where Bradley had been a patient. Dr. Hopps testified at the trial that he had previously diagnosed Bradley as a manic depressive. Dr. Hopps admitted, however, that Bradley had previously been diagnosed by other physicians as suffering from schizophrenia. There is some evidence Bradley had improved during the period of the prior ministrations of Dr. Hopps who had treated him with lithium, a recognized and reasonably successful treatment for manic depression.

One of the two major factual issues in this case is the correct diagnosis and treatment of Bradley's illness and whether misdiagnosis, and/or failure by physicians of the Reno Veterans Administration Hospital to prescribe appropriate treatment, contributed as a proximate cause to Bradley's death. The other principal factual question to be faced by the Court is whether Bradley should have been permitted by the hospital personnel to go on the recreational outing at Virginia Lake with the other patients on October 3, 1978.

Since the principal thrust of the complaint boils down to a claim of malpractice in respect to the physicians and staff at the Reno hospital, the substantive malpractice issues in the case are governed by Nevada law. 28 U.S.C. § 1346(b), *supra; see also Kubrick v. United States,* 444 U.S. 111, 116, 122, 100 S.Ct. 352, 356, 359, 62 L.Ed.2d 259 (applying Pennsylvania standard of care to Federal Tort Claim due to

malpractice). Under Nevada law, unless he represents he has greater or less skill or knowledge, one who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities. *Orcutt v. Miller*, 95 Nev. 408, 595 P.2d 1191 (1979), *citing* Restatement (Second) Torts § 299 A (1965) (Standard of care relating to physicians). There is an exception to this "locality" rule for board certified specialists. According to the Restatement, specialists are to be judged on a standard measured by the skill and knowledge common to other specialists. *Id.*

The standard of care as it relates to physicians and related staff in this locality (Reno-Sparks, Nevada) or to board certified specialists in psychiatry was not placed in issue at trial. As a result, the physicians and related staff members in this case are to be evaluated on the basis of their exercise of due care in diagnosis and treatment of Bradley. More precisely, the action of the defendant, through its physicians and related staff, should be considered in the context of the testimony given by the experts on both sides as to whether these employees of the Government acted skillfully, prudently, and carefully under the circumstances.

■ It is well settled that negligence may exist in diagnosis, as well as in treatment. *Corn v. French*, 71 Nev. 280, 289 P.2d 173 (1955). No higher degree of responsibility is imposed in making a diagnosis, however, than in prescribing treatment. *Id., citing* respondent's brief in *Corn.*

■ The defendant, through its hospital and employees, cannot be charged with the responsibility of "insuring" the physical safety of its patients. *See Sklarsh v. United States*, 194 F.Supp. 474 (D.N.Y.1961) (patient jumped out window; U. S. held not liable). Such a degree of responsibility would place an unreasonable burden on the treating institutions. Furthermore, absolute or strict liability cannot be imposed on the United States. *Laird v. Nelms*, 406

U.S. 797, 802–803, 92 S.Ct. 1899, 1902, 32 L.Ed.2d 499 (1972).

■ The defendant has contended that even if negligence was present in the diagnosis and treatment of Bradley, these actions are excluded from liability under the "discretionary function" exclusion of the Federal Tort Claims Act. 28 U.S.C. § 2680(a). However, diagnosis and treatment of patients is beyond the "discretionary function" exclusion or exception of the Federal Tort Claims Act. *Id.; see also, Smith v. United States*, 437 F.Supp. 1004 (D.Pa.1977). The discretionary function exception must be measured against the broad spectrum of administrative power which ranges from the establishment of programs, the issuance of regulations, and the granting of licenses, to narrow decisions where administrative discretion stops and liability in tort begins. *White v. United States*, 317 F.2d 13 (4th Cir. 1963) (government's actions in permitting a mental patient with suicidal tendencies to have outpatient privileges not within discretionary exception); *Cf. Barton v. United States*, 609 F.2d 977 (10th Cir. 1979) *citing Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953) (lengthy discussion of § 2680(a) and legislative history); *see also Driscoll v. United States*, 525 F.2d 136 (9th Cir. 1975) (discretionary functions are at policy/planning, not operational level).

Two physicians, Dr. Grant Miller and Dr. Edward Lynn, and a psychologist, Dr. Thomas Sheehan, employed at the Reno hospital, contend that the correct diagnosis for Bradley was schizophrenia, rather than manic depressive.

All of the medical doctors and the psychologist who testified in the case make persuasive arguments in support of their respective diagnoses. There are certain symptoms peculiar to the respective diseases of manic depression and schizophrenia. On the other hand, there are certain symptoms which overlap both diseases.

The Veterans Administration physicians testified that Bradley did not have certain symptoms of manic depression, such as peri-

odic feelings of elation and high good spirits, and that while he had certain of the overlapping symptoms of both manic depression and schizophrenia and there were gray areas of symptoms between the two, he was correctly diagnosed as having schizophrenia.

At the time of Bradley's admission, Dr. Miller, who was the psychiatric ward physician, made the basic diagnosis for the hospital and Dr. Lynn, who was the supervisor of the psychiatric ward, examined Bradley and his records and concurred in the diagnosis. Thomas F. Sheehan, Ph.D., a clinical psychologist, also treated Bradley and agreed that Bradley was suffering from schizophrenia.

On the other hand, Dr. Hopps contends that this diagnosis of schizophrenia was wrong and bordering on malpractice, if not constituting actual malpractice. He believes that the better reading of the symptoms made it clear that Bradley was a manic depressive and should have been treated with lithium for that disease, rather than treated for schizophrenia as he was. Interestingly enough, plaintiffs' expert, Dr. Richard Gilmore, testified that in his opinion Bradley's illness was schizophrenia.

The three Veterans Administration doctors and Dr. Gilmore, on the one hand, and Dr. Hopps, on the other hand, all appear to be very competent physicians and doctors. Each party raises suspicions about the testimony of the witnesses for the other side on the basis of motives which the respective doctors might have for testifying as they have. On the one hand, the Veterans Administration doctors are obviously placed in a position of defending their diagnosis and the occurrences which took place, as well as defending their employer which is being sued in this action. On the other hand, the Government contends there are reasons to suspect Dr. Hopps' testimony. It appears that Dr. Hopps may have left his employment with the Veterans Administration because of serious personal problems relating to the death of his wife of cancer. Also, there may have been some disagreements between Dr. Lynn and Dr. Hopps relating

to Dr. Hopps promotion to a higher rank at the University of Nevada Medical School where Dr. Hopps had been teaching part-time. Testimony was received that Dr. Hopps might even now be interested in returning to the Reno area but that Veterans Administration doctors are opposed. On the contrary, Dr. Hopps stated he had left his employment with the Veterans Administration on a completely amicable basis and that more recently, in fact, he had been recommended by Dr. Lynn for appointment as head of the Nevada State Mental Hospital.

A judge looking at a case like this is left puzzled as to whom to believe. In its consideration of the case the Court is limited solely to the evidence admitted at trial. The Court is not in a position, except purely on the evidence before it, to try to figure out which was the correct diagnosis or whether the testimony of the doctors might have been colored by their personal interests or feelings in regard to the case and the other participants in the case.

Based on the admitted evidence, the Court is not able to make a finding that the diagnosis of Bradley as a schizophrenic by the Veterans Administration doctors was incorrect or was made negligently. The contrary diagnosis of Dr. Hopps presents the same problems. Diagnosis is an art as well as a science, a matter of weighing various symptoms, physical signs, past diagnoses, past treatments, and other relevant factors to try to figure out a correct conclusion as to what, if any, is the particular illness from which the patient suffers, and, hence, the proper treatment. The doctors on both sides carefully considered Bradley's various symptoms and have reached opposite conclusions. It could well be that both diagnoses were correct. In each case there is evidence that the doctors were highly competent and did their best to make a proper judgment. The fact that Bradley did die does not change this conclusion. Rather, it is a question of how things looked or should have looked to the doctors at the time they were trying to make the diagnosis.

In light of this analysis, the Court finds the defendant, through its physicians and related staff at the Reno Veteran's Administration Hospital, was not negligent in its diagnosis. The assessment of Bradley's illness by the physicians and staff of the hospital was reasonable, prudent, and within the standard of care to which these doctors are held. *See, Orcutt, supra; Corn, supra.*

Once the diagnosis of schizophrenia was made by the doctors at the hospital, there came a question of what the proper treatment should be. Dr. Miller, Dr. Lynn and Dr. Sheehan all concur that prolixin was a proper drug to be administered. There is a dispute as to whether the amounts of prolixin exceeded those which ought to have been administered. Dr. Migdall, a forensic pharmacologist testified that prolixin should be administered only in dosages of 2 to 10 milligrams per day and that dosages in excess of 20 milligrams should be prescribed only with precautionary measures. On numerous days during his hospitalization from September 15 to October 3 Bradley received dosages of prolixin substantially in excess of 20 milligrams. Dr. Migdall's testimony was based upon the manufacturer's recommendations and the Physicians' Desk Reference (PDR).

Plaintiffs' expert, Dr. Gilmore, a psychiatrist in private practice in Reno, confirmed the testimony of Dr. Migdall. He testified that if more than 20 milligrams per day were prescribed, the vital signs of a patient (blood pressure, pulse, etc.) should be frequently checked. Bradley's vital signs were not so checked. Dr. Gilmore also testified that a patient receiving such large dosages of prolixin should be examined daily to determine if side effects are developing and should be closely observed. There is a dispute in the case as to whether observation of Bradley met acceptable standards. The Veterans Administration doctors take the position that the fact of the hospitalization of Bradley, with the large Veterans Administration staff on duty, constituted adequate observation, but it may be inferred from the testimony of Dr. Gilmore that a closer watch over Bradley was desirable.

Still the Court is not convinced that if there were excessive dosages of prolixin prescribed such dosages contributed to the death of Bradley Moon. Persons who are being treated with prolixin are more subject than others to hypothermia (the lowering of body temperatures). There was some indication of hypothermia occurring during Bradley's hospitalization shown by at least two temperatures taken.

■ Assuming, arguendo, negligence was present in the administration of prolixin to Bradley, it cannot be found that such was the proximate cause of Bradley's death. Proximate cause is a prerequisite for a finding of liability due to negligence under Nevada law. *Mahan v. Hafen*, 76 Nev. 220, 351 P.2d 617 (1960); *Bowman v. Tisnado*, 84 Nev. 420, 442 P.2d 899 (1968). The administration of the drug was not the act that in natural or continuous sequence resulted in Bradley's death and without which his death would not have occurred. *See, Bowman, supra*, and *Castillo v. United States*, 552 F.2d 1385 (10th Cir. 1977) (defining proximate cause). Furthermore, it is not clear that his death was the result of hypothermia, induced by administration of drugs or from drowning, or some other cause. The death certificate indicates hypothermia was a secondary contributing factor to Bradley's death, but it seems as likely the cold water of Virginia Lake in October of 1978, caused the hypothermia as much as any possible excessive dosages of prolixin. Patients at the hospital who were being treated with prolixin had been taken on skiing outings in the Sierras with success. Such outings would have exposed persons susceptible to hypothermia to much colder elements than, as in this case, an outing near a lake with cold water.

Further, there is a serious dispute as to whether the dosages of prolixin prescribed were in fact excessive. Although Dr. Hopps and Dr. Gilmore (Dr. Gilmore testified that different medications should have been prescribed rather than prolixin) felt that the dosages were excessive, none of the Veterans Administration doctors agreed.

The contents of certain legal treatises read into the record indicated the dosages were appropriate. The limitations on prolixin dosages set out by manufacturers and in the PDR appear to the Court to be merely cautionary for physicians and not to present any absolute limits for the amounts of such medication which may be safely prescribed.

■ Based on the record before the Court, the Court has no alternative but to conclude that the treatment of Bradley, including the administration of the drugs he received, was reasonable, skillful, and prudent, for the treatment of schizophrenia. Though there may be dispute as to how each physician might have treated Bradley for this disorder, the treatment given was within the standards allowable and not negligent. *See, Orcutt, supra; Corn, supra.*

■ Finally, there is the question of Bradley's supervision while under the care of defendant.

Shortly after Bradley was admitted to the hospital in September of 1978 he indicated suicidal tendencies to the attendants. Bradley was then placed on what the hospital called "close observation", which meant that he was closely supervised by the nurses and other employees. Apparently persons who evince an intent to commit suicide do not stay in that particular frame of mind for any extended period of time beyond a few hours or, a day at the most. Bradley was released from close observation within a couple of days.

The hospital maintains a "level" system whereby patients are graded for various degrees of supervision starting at level 0 or 1 where they are essentially confined to the hospital ward, except to leave to receive other medical treatment in the company of hospital attendants; to level 2 where they are permitted to go on recreational outings, such as that which occurred on October 3, 1978; and to the higher levels 3 and 4 where they are permitted to leave the hospital under varying circumstances.

It does appear the usual practice was that if a level 2 patient exhibited suicidal tendencies or had recently eloped (this is apparently the medical term for leaving the hospital or other supervised activity without permission) he would be reduced to a level 1. However, it is unclear that this was an absolute, unbending and rigid rule. Rather, while perhaps it would be presumed this might be done, changes of level seem to have been administered on more of a case by case basis.

Bradley was graded at level 2 on October 2, 1978, the day before the accident, and did elope from the hospital on that day. At the same time he had evidenced some suicidal gestures. Still he was permitted to go on the outing on October 3. The staff members who accompanied the group for the outing from the hospital on October 3 were familiar with the occurrences of October 2, but made a judgment that Bradley could safely accompany the group.

Dr. Gilmore testified that under the circumstances Bradley should never have been allowed to go on the outing, but rather should have been committed to the state hospital on an involuntary basis and placed in a "pozzi belt". This is apparently a webbed belt with a lock which is fastened around the body of a patient and to the bed so that the patient cannot get up. Dr. Hopps, basing his testimony on his previous experiences with Bradley (but having no apparent contact with Bradley subsequent to his admission) and examination of the medical records testified that permitting Bradley to go on the outing was malpractice.

In addressing this problem the Court is faced with trying to second-guess philosophies of treatment of psychiatric patients. Years ago psychiatric patients were pretty much locked up and the key was thrown away. At the opposite end of the spectrum of public perception today, many people have the impression that modern psychiatry permits psychotic patients to freely move at large in the community. It does appear, that in recent years, the trend of more enlightened psychiatric practice is somewhere between the two extremes, but that able physicians and psychologists still disagree on the extent to which, and circum-

stances under which, patients should be allowed visits away from the hospital. It is, at best, difficult to judge who is right.

Every time a psychiatric patient leaves the hospital there is a possible risk both to him and to the community. Obviously, in some cases psychiatric patients are too dangerous to themselves and others to be permitted to leave the hospital and in other cases there is little more danger than from many persons moving about the community who have no diagnosed psychiatric problems at all. It is the "in-betweens" where the doctors must use their best judgments in determining whether such persons should be permitted to leave the hospital and, if so, under what conditions. Dr. Lynn testified to a particular interest in benefits to be derived from patient recreation outside the hospital, while Dr. Gilmore has grave doubts about such practices in the circumstances of this case.

It was the professional view and belief of the staff at the hospital that Bradley's apparent suicidal gestures and elopements from the hospital were an attention getting device (in psychiatry termed "acting out behaviour") consistent with the schizophrenic diagnosis. The correct reaction to attention getting activity is to ignore it, and this course was consistently followed by the hospital personnel. It was a matter of medical and psychological judgment, under the conditions of Bradley Moon's case, as to whether he should be allowed out of the hospital for the outing on October third. If in fact the gestures and elopements were not genuine in nature, then certainly Bradley should have been permitted to go on the outing. This was a judgmental matter with the doctors. There must be some reasonable latitude given to them in making such judgments. While it was the view of both Dr. Gilmore and Dr. Hopps that taking Bradley on the outing constituted negligence, neither of them had seen or treated Bradley during the period he was in the hospital subsequent to his admission. Although the doctors who did make that judgment may have something to gain by claiming at this time that the judgment permitting Bradley to go was correct, it is difficult to postulate negligence upon the fact that they decided to let him go.

It does not follow from even what occurred to Bradley that there was in fact negligence. There is no credible evidence in this case that Bradley committed suicide. The more believable view is that in diving into the lake and swimming around Bradley was seeking attention and did not mean to harm himself. There was no indication that he was in distress while he was swimming in the lake or intended to do away with himself.

■ This is not to say that defendant's hospital and doctors, who have been treating patients with a history of behavior disorders, are shielded from liability in all instances. Certain circumstances may require the imposition of liability. *See, Williams v. United States*, 450 F.Supp. 1040 (D.S.D.1978) (V.A. hospital held liable for death of person killed by patient released by hospital, where violent tendencies of patient known to the hospital). Absent a showing of negligence, however, the defendant cannot be held liable for Bradley's death, merely because he was under the Veterans Hospital's care. *See, Castillo v. United States*, 406 F.Supp. 585 (D.N.M. 1975), *aff'd*, 552 F.2d 1385 (10th Cir. 1977) (voluntarily committed mental patient eloped from hospital, jumped in front of train committing suicide; U. S. held not liable); *White v. United States*, 244 F.Supp. 127 (D.Va.1965) *aff'd*, 359 F.2d 989 (4th Cir.) (patient on privileged status left hospital grounds and was killed when he stood in front of train; U. S. not held liable).

There is a further question which must be answered and that is whether there was appropriate supervision of the group of patients recreating at the lake and whether, after Bradley bolted from the group, a proper search was instituted. There were at least two attendants watching over the patients at all times during the outing. Additional attendants were present for part of the time the patients were at the lake. Even if there had been more attendants, there is no indication that they would have been able to prevent Bradley from running away as he did.

When the group first arrived at the lake, two of the attendants walked with Bradley and other patients around its perimeter. Bradley appeared to be somewhat agitated and upset. Later, in a park area adjacent to the lake, some of the patients were playing with frisbees and others were playing cards. While at that time Bradley had ranged fairly far away from the remainder of the group, there was no particular reason to believe a problem would arise. Then suddenly Bradley sprinted across the park area and ran in a northerly direction. It should be noted that Bradley had eloped from the hospital on several occasions and each time had quite promptly returned on a voluntary basis. Very shortly after Bradley ran away, two additional patients who had just walked up to join the outing reported that they had observed him at some distance from the park running on the street adjacent to the lake, weaving in and out of the traffic and doing hand stands.

The patients who made the report of Bradley's whereabouts were graded at levels 3 or 4, so that they were not subject to security precautions in the manner of the others on the outing. They had been instructed to join the group, after completing job interviews. Since these patients had seen Bradley's location, the attendants felt that they had the best chance of locating him, and so they were sent back to try to find him at the point where he had last been seen near the lake. Then, within a few minutes the two attendants on the scene gathered the other patients together and loaded them into the van used to transport a portion of the party on the outing. One of the attendants then drove that van in one direction around Virginia Lake and the other attendant, a registered nurse, drove her personal automobile, which she had used for transportation to the outing, in the opposite direction around the lake. After that the nurse drove around the streets in the vicinity of the lake to see if she could locate Bradley, but without success. The group then proceeded back toward the hospital along a route which they felt Bradley might be following. During the time the party was at the lake Bradley had expressed the desire to return to the hospital prior to the anticipated end of the outing and hence it was believed he might be in the process of walking back to the hospital.

Within an hour or so after the hospital group left the lake area, it was reported, as mentioned above, that Bradley had been seen to dive into the lake, swim about, and to disappear beneath the waters. His body was located by law enforcement personnel shortly after that time.

Bradley was a very athletic young man and it does not appear reasonable to believe that the attendants could have caught up with him had they run after him. The search which was conducted does not appear to have been conducted in a negligent fashion, but rather in a sensible fashion in view of all the circumstances. The Court does not find negligence to have occurred in that respect.

▇ The Court does not find that the supervision over Bradley at the lake outing or the search for him after he eloped was the proximate cause of his injury. *See, Castillo, supra, Bowman, supra.* His death resulting from the alleged negligence could not have been anticipated by a reasonably prudent person. *Castillo, supra.*

Looking back, it is rather easy to have 20/20 hindsight and it is easy now to say that something different should have been done than was done in all of this sequence of events. But the Court must view conditions as they existed at the time and try to see whether there was such want of attention to the nature or the probable consequence of any act or omission, as a reasonably prudent man ordinarily bestows in acting in his concerns of like importance. *Konig v. Nevada-California-Oregon Railway,* 36 Nev. 181, 135 P. 141 (1913). This test focuses on the activities of the Veterans Administration physicians and related staff to see whether as trained persons, exercising acceptable levels of skill, they failed to give the requisite attention to the nature of probable consequences of what they did or didn't do. Psychiatric treatment probably presents as much of a problem to the courts as any other activity in trying to determine what a reasonably prudent person would or

wouldn't do. It isn't at all clear in this case from the evidence that prudent physicians, psychologists, nurses and attendants would have acted in a fashion any different from that which the participants in the subject case actually did. The Court does not find negligence.

The Court is fully sympathetic with the bereavement, sadness and outrage of the family and their love for their only son. But the sworn duty of the Court is to look at the facts and to make its judgment based on the evidence and testimony elicited at the trial. The plaintiffs, the defendant, and the public must expect no more and no less from the Court than that cases be decided without fear, favor, sympathy, prejudice, or bias.

On this basis, and it must be aside from any emotional feelings the Court may have, it is clear the Court must find that judgment should be entered for defendant. Plaintiffs have not met the burden of proving their case by a preponderance of the evidence.

This decision shall be deemed to constitute findings of fact and conclusions of law for this case.

The Clerk of the Court shall enter judgment herein in favor of defendant and against plaintiff.