Corrine CASTILLO, as Administratrix of the Estate of Richard Montoya, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. No. 75–088M.

United States District Court, D. New Mexico.

Dec. 17, 1975.

McCulloch, Grisham & Lawless, Albuquerque, N. M., for plaintiff.

Victor R. Ortega, U. S. Atty., Mark C. Meiering, Asst. U. S. Atty., Albuquerque, N. M., for defendant.

## FINDINGS OF FACT
### and
## CONCLUSIONS OF LAW

MECHEM, District Judge.

The above entitled action having come on for trial, and the Court having heard the evidence and the arguments of the parties, the following findings of fact and conclusions of law are hereby made.

### FINDINGS OF FACT

1. Plaintiff Corrine Castillo is the personal representative of Richard Montoya for the purpose of bringing this action as Administratrix of the Estate of Richard Montoya, deceased.

2. Defendant is the United States of America.

3. The Veteran's Administration is a federal agency.

4. On October 7, 1974, plaintiff made a claim for damages to the Veteran's Administration, which claim was finally denied by the Veteran's Administration not more than six months prior to the filing of this action.

5. The Veteran's Administration operates and maintains the general hospital facility referred to in this action as the Veteran's Administration Hospital located at Albuquerque, New Mexico (Hospital), which includes a psychiatric ward, designed and used for patients suffering from mental conditions or diseases.

6. The Hospital's psychiatric ward is an "open ward", which identifies both a particular theory concerning the treatment of mental illness, and a particular manner in which the ward is operated.

7. An open ward is a generally accepted medical and psychiatric theory of treatment of mental illness, in that psychiatric treatment cannot effectively be forced upon a patient; instead, the patient must be encouraged to want psychiatric treatment, and to accept the responsibility of seeking psychiatric help and learning from it, which places real emphasis on building rapport between patient and psychiatrist.

8. The open ward dictates various practices and procedures followed by the Hospital's psychiatric ward. To encourage the patient to accept responsibility for his own treatment, patients who are not the subjects of civil commitment proceedings (voluntary patients) are not, except as found below, physically limited in their movements around the ward or of the Hospital and its grounds, or subjected to close observation by staff members. If a voluntary patient expresses a firm desire to leave, the open ward allows him to. The staff will verbally encourage him to stay and continue treatment.

9. Therefore, the Hospital's psychiatric ward has no guards, no room checks, and no check-in check-out procedure, and patients are allowed to keep their own clothes, wallets and valuables.

10. Restraints upon a patient's freedom of movement are imposed on a very individualized basis, and only when the staff feels it necessary to protect the patient from doing physical harm to himself or others. Where physical restraint or supervision is deemed necessary, open ward requires the use of the least restrictive measure which will protect the patient and others from direct physical harm.

11. The restraints usually used on patients are: 1) medication; 2) group pressure, primarily from fellow patients; 3) locking the patient in a single treatment room.

12. Plaintiff's decedent, Richard Montoya (Montoya), served in the armed forces from March of 1968 until April of 1970. As a veteran, Montoya was entitled to medical treatment at Veteran's Administration facilities.

13. Montoya was first admitted to the Hospital on June 16, 1970, to be treated for a cut on his palate. It is undisputed that Montoya made the cut on his palate himself; it is not clear whether he made the cut because he wanted to lance an abcess on the roof of his mouth, or for darker psychological reasons.

14. Because of this, Montoya was transferred from the surgical ward to the Hospital's psychiatric ward within a few days of his initial admission.

15. Staff doctors on the psychiatric ward diagnosed Montoya on June 16, 1970, as experiencing a "schizophrenic reaction psychosis", that being a mental condition characterized by ambivalence, confusion, and bewilderment. Patients with such a condition may become autistic, and are frequently disassociated from reality to an appreciable extent. The severity of the patient's condition varies greatly over time; at some times he may be relatively normal, and at other times extremely disturbed. The condition, in many cases, responds to treatment with psychotropic drugs.

16. Between June of 1970 and October of 1972, inclusive, Montoya was admitted to the Hospital's psychiatric ward as a voluntary patient nine times. These admissions were variously initiated by himself and/or members of his family. On each of his last four admissions before his admission on October 16, 1972, Montoya remained at the Hospital for a short time and then left without notifying the staff that he was leaving, and despite the staff opinion that he should continue treatment. The Hospital refers to such as "elopement".

17. When Montoya eloped from the Hospital, he would walk or take a cab back to Belen to the home of one of his relatives.

18. Between June of 1970 and October of 1972, when Montoya was not an inpatient at the Hospital's psychiatric ward, he lived with various members of his family in Belen, New Mexico, all of whom allowed him to come and go as he pleased, and stated that they believed that Montoya was not a danger to himself or others.

19. By October of 1972, the Hospital was well aware of Montoya's tendency to elope.

20. Prior to October of 1972, Montoya had occasionally behaved in a physically aggressive manner towards others. On at least one occasion, Montoya's physical aggression towards another member of the family prompted the members of the family to talk him into voluntarily returning to the Hospital for treatment. At least once, Montoya became physically aggressive towards another patient in the psychiatric ward.

21. The Hospital was aware that Montoya had had episodes of physical aggression towards others, but in light of all the facts and circumstances of his case as known to them since June of 1970, the staff doctors reasonably believed that these were relatively isolated incidents which occurred primarily when Montoya had refused to take medication prescribed for him, and that Montoya was not dangerous to others in October of 1972.

22. Based on all the facts and circumstances as known to the Hospital staff since June of 1970, the judgment of the staff doctors that Montoya was not dangerous to himself or to others was a medical diagnosis made in accordance with the recognized standards of medical practice and treatment in the community. Other than the time Montoya cut his palate, for whatever reason, he never engaged in any behavior which could be termed consciously or actively self-destructive or suicidal. The staff doctors reasonably believed that Montoya was not dangerous to himself in October of 1972, which was a medical diagnosis made in accordance with the recognized standards of medical practice and treatment in the community.

23. In June of 1971, and again in September of 1971, Montoya's family began proceedings to have him civilly committed to the Hospital. These efforts were subsequently dropped by the family. The September 1971 proceedings were dropped on September 24th because the family had decided that Montoya should be sent to a Veteran's Administration facility at Fort Lyons, Colorado, which maintained a locked psychiatric ward, and which would not accept patients who were subject to civil commitment orders.

24. In October of 1971, Montoya's family decided not to pursue their efforts to have Montoya sent to Fort Lyons, Colorado.

25. Since his first admission in 1970, Montoya had been told to take major tranquillizers, which had been prescribed by the Hospital staff. Montoya's medical records show that he would discontinue taking these medications on his own initiative and without the knowledge or approval of the Hospital staff.

26. By October of 1972, the Hospital staff had diagnosed Montoya's condition as "chronic undifferentiated schizophrenia".

27. Montoya was admitted to the Hospital's psychiatric ward three times during 1972.

28. On June 22, 1972, Montoya voluntarily admitted himself to the Hospital's psychiatric ward. The record states that he complained of nervousness, felt a compulsion to break things, had in fact broken records and a light bulb, and had not taken the medication prescribed for him for some time. During this stay, Montoya was given medications, including Thorazine, a major tranquillizer. On July 6, 1972, he eloped from the Hospital. In the discharge notes of July 10, a staff doctor noted that the staff did not feel Montoya was then dangerous to himself or others.

29. On August 22, 1972, Montoya voluntarily admitted himself to the Hospital's psychiatric ward. The records note that at the time of his admission, Montoya appeared to be having an acute psychotic episode, that his judgment was impaired and his affect inappropriate. Montoya eloped from the Hospital the next day. In the Hospital's summary of his hospitalization, the staff doctor noted: "Since he lives in Belen and is quite well known to his family, and that [sic] this is the constant pattern of his being in and out of the hospital, the patient was felt to be safe to return."

30. On October 16, 1972, Montoya asked Joe Castillo, his brother-in-law, and Joe Montoya, his brother, to take him to the Hospital so that he could voluntarily admit himself as a psychiatric patient, where he was admitted as a voluntary patient in the psychiatric ward.

31. In this admission, a staff doctor noted that Montoya had discontinued his prescribed medication some time previously, had been acting out anger by beating a dog and breaking things with a cane in the barbershop in Belen, that his thought was "vague and irrelevant" and that he appeared to be experiencing visual and auditory delusions, but that on the whole, his condition was the same as it had been at the time of his previous admissions.

32. Among the forms filled out by doctors in admitting patients to the psychiatric ward there is one that contains a space for the admitting doctor to indicate any special precautions to be taken concerning the patient, with spaces to be checked if the patient is prone to elopement, or is suicidal.

33. On October 16, 1972, the staff doctor did not indicate that any special precautions should be taken concerning Montoya, nor did he check the boxes indicating that he was prone to elopement or was suicidal.

34. This form is used within the Hospital and is sent along when the patient moves from one area of the Hospital to another.

35. When he was admitted on October 16, 1972, Montoya was given an injection of Prolixin, a major tranquillizer.

36. During the two days that he remained in the Hospital, Montoya exhibited no symptoms which would have suggested that he was experiencing undue side effects from the administration of the Prolixin.

37. Prolixin generally reduces anxiety and helps a patient to think more clearly.

38. On previous admissions Montoya had responded well to the administration of Prolixin and other major tranquillizers.

39. Based on previous experience with Montoya, and the knowledge of his mental condition and behavior since June of 1970, the staff doctor who admitted him in October of 1972 reasonably believed that he was not dangerous to himself or others, and that the administration of Prolixin would calm Montoya and put an end to the tendency to act out anger that had caused him to voluntarily admit himself to the Hospital. This was a medical diagnosis made in conformance with the recognized standards of medical practice and treatment in the community.

40. On October 17, 1972, Montoya was allowed to leave the psychiatric ward to participate in occupational therapy.

41. On October 18, 1972, Montoya was last seen by the Hospital staff at about 5:00 P.M., after which he eloped from the Hospital and traveled to Belen, New Mexico.

42. At approximately 7:30 P.M. that day, he was seen in the Santa Fe train yards near Belen, New Mexico, by William J. Seymour, an employee of the Santa Fe Railway.

43. At the time he was first seen by Seymour, Montoya was about 75 feet away from Seymour's train, and was approaching the engine of the train.

44. The brakeman on the train yelled at Montoya, who walked away from the engine, towards the rear of the train, which was moving at a speed roughly six to eight miles per hour.

45. Seymour had the impression that Montoya was trying to step onto the train.

46. Montoya was familiar with the Santa Fe train yards and the dangers inherent to the train yards, as one who had on occasion boarded and ridden, in an unauthorized manner, trains leaving the yards.

47. Shortly after Montoya was last seen by Seymour, he was run over and killed by the train Seymour was on.

48. The record does not permit a finding, based on a preponderance of the evidence, as to how Montoya got underneath the train or otherwise in a position in which he could be run over by the train. On the record of this trial, it is equally possible that Montoya slipped and fell under the train, or that he deliberately threw himself under the train.

49. At about 8:00 P.M. that night, the Belen Police notified Corrine Castillo that Montoya had been run over and killed by the train.

50. At about 9:00 or 9:30 P.M., Corinne Castillo called the Hospital and asked to speak to Montoya. When the response indicated that the person she was speaking to believed Montoya was still in the Hospital, she told the Hospital of his death.

51. The Veteran's Administration Manual, *Standard Administrative Procedures for Psychiatric Services in Veteran's Administration Hospitals* (hereafter, the Manual), provides at § 205a as follows:

A basic responsibility in the treatment of psychiatric patients is the protection of the patient and others from the effects of the patient's illness. All employees will maintain close observation of patients who have known or suspected suicidal, assaultive, convulsive, or elopement tendencies, and will report any such apparent tendencies promptly to the ward physician, ward nurse, or other professional personnel.

52. On its face, § 205a applies only to non-professional personnel, who are enjoined to be aware of actions on the part of patients which may indicate that they are contemplating behavior that the professional staff should be aware of. The regulation, by its terms, does not impose a duty of close observation on the professional staff, nor does it impose any particular course of action on the professional personnel when they become aware that a patient might be contemplating elopement from the Hospital.

53. It does not restrict professional personnel of the Hospital in the exercise of their professional judgment concerning the proper manner in which to deal

with a patient who may be contemplating elopement.

54. The professional personnel of the Hospital do not generally keep close watch or supervision over patients with elopement tendencies unless the patient, in their judgment, is dangerous to himself or others.

55. The Manual, at § 84, defines "elopement" as "the unauthorized absence of a psychiatric patient from hospital supervision."

56. The Manual, at § 85a, provides that the Registrar, on notification of a patient's elopement, will:

    *     *     *     *     *     *

(2) notify the patient's guardian or nearest relative. The telegram and/or letter to the guardian or nearest relative will be prepared on instructions from the ward physician. It will be tactfully worded, and will be forwarded over the signature of the Manager or Chief, Professional Services. The guardian or nearest relative will be informed of the action the hospital desires taken if the patient's whereabouts become known.

(3) notify the local civil authorities, giving a description of the patient and clothing he was wearing, his probable destination, and his behavior patterns, if the patient has been committed and/or is potentially dangerous to himself or to others, or when such action is considered advisable for other reasons.

and, at § 10.24 provides:

Prompt notification will be made to the guardian and/or next of kin of persons placed on unauthorized absence status. In addition, the Commanding Officer of active duty military personnel will be notified. If the person is considered dangerous to himself or others, or if otherwise considered necessary, the appropriate law enforcement agencies will be notified. Such notifications usually will be relayed by telephone, and the recipients will be advised as to the actions they should take if the person's whereabouts becomes known to them. They should be promptly informed if the person returns from unauthorized absence or is located through some other source. The court of commitment (if any) will be notified when required under State laws.

57. While §§ 85 and 10.24 do require notification of the guardian or relative of a patient who has eloped, it is clear from the text that such notification is not regarded as an emergency measure for the protection of the patient, but rather as an administrative and bureaucratic procedure.

58. It is clear that when the Hospital staff believes the eloped patient's apprehension is necessary to protect him or others, the Hospital notifies and relies on local law enforcement authorities, rather than the patient's family or relatives.

59. The medical and administrative records concerning Richard Montoya show that the Hospital was aware that Montoya had not shown up for supper on the night of October 18, 1972.

60. Approximately three hours elapsed between the time Montoya was last seen at the Hospital and the time that he was killed.

61. Based on all the facts and circumstances of Montoya's case, including the nature of his mental disease or condition, and his behavior as known to the Hospital staff since June of 1970, the judgment of the Hospital staff that Richard Montoya was not dangerous to himself or others in October of 1972 was a medical diagnosis made in conformity with the recognized standards of medical practice in the community; it was not foreseeable that Montoya would harm himself or come to harm in any other manner if he eloped from the Hospital in October of 1972; the Hospital was not negligent in failing to more closely observe Richard Montoya; and the Hospital was not negligent in failing to immediately notify Richard Montoya's relatives as soon as he was noticed to be absent on October 18, 1972.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties to and the subject matter of this action.

2. Because Richard Montoya was a voluntary patient and not the subject of civil commitment proceedings or an order of civil commitment, the Hospital staff had no legal authority to force him to remain a patient.

3. The Hospital staff is authorized to initiate civil commitment proceedings against a patient only if hospitalization appears necessary for his safety or the safety of others. 38 C.F.R. § 13.51(b).

4. It is constitutionally impermissible for a state, through the civil commitment process, to confine a non-dangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends. *O'Connor v. Donaldson*, 422 U.S. 563, 576, 95 S.Ct. 2486, 2494, 45 L.Ed.2d 396, 407 (1975).

5. Whether a person is dangerous to himself or others is a medical determination. *In the Matter of Valdez*, 540 P.2d 818, 921 (N.M.1975).

6. There must be clear and convincing medical evidence demonstrating that a person is a danger to himself or others before a person may be confined. *In the Matter of Valdez*, supra.

7. The diagnosis and treatment of Richard Montoya by the Hospital staff comported in all relevant respects with the recognized standards of acceptable medical practice and treatment in the community.

8. Under the law of the State of New Mexico, the "[concept of negligence] encompasses within its meaning the concepts of foreseeability of harm to the person injured and the duty to use ordinary care." *Latimer v. City of Clovis*, 83 N.M. 610, 615, 495 P.2d 788, 793 (1972); *Kelly v. Montoya*, 81 N.M. 591, 470 P.2d 563 (1970); *Martin v. Board of Education of the City of Albuquerque*, 79 N.M. 636, 447 P.2d 516 (1968); *Lujan v. Reed*, 78 N.M. 556, 434 P.2d 378 (1967).

9. The Hospital staff was not negligent in failing to more closely observe Richard Montoya during his hospitalization in October of 1972.

10. The Hospital staff was not negligent in failing to immediately notify Richard Montoya's relatives as soon as it became apparent that Montoya had left the Hospital on October 18, 1972.

11. The doctrine of negligence per se is not applicable to this case. At trial, plaintiff stipulated that the care and treatment Montoya received from the Hospital was in accordance with the recognized standards of medical practice and treatment in the community, and that plaintiff's claim did not rest on malpractice or negligence in the care given. Plaintiff's theory of the case was based on the alleged violation of hospital regulations which were urged to give rise to negligence per se. I have found that the regulations do not mean what plaintiff contends that they mean. However, even if they were susceptible to the interpretation plaintiff places on them, it does not appear that the doctrine of negligence per se would apply. Under the law of New Mexico, that theory has only been applied to cases in which a state statute or municipal ordinance has been violated. See, e. g., *Kelly v. Montoya*, 81 N.M. 591, 470 P.2d 563 (1970); *Burran v. Dambold*, 422 F.2d 133 (10th Cir. 1970); *Sanchez v. J. Barron Rice, Inc.*, 77 N.M. 717, 427 P.2d 240 (1967); *Fitzgerald v. Valdez*, 77 N.M. 769, 427 P.2d 655 (1967). It is one thing to hold that the violation of law, or of an ordinance having the force of law, is negligence as a matter of law; it is quite another to apply the doctrine to internal administrative regulations. However, since the point is not presented on these facts, it is unnecessary to decide whether the law of New Mexico would extend the doctrine to such regulations. Therefore, they have been considered in this case as one factor which is relevant to determining the extent of the duty owed to Montoya and whether the duty was breached; they have not been regarded as conclusive. In view of plaintiff's argument in the trial brief, it may also be well to point

out that under New Mexico law, as established in the cases cited above, the doctrine of negligence per se only goes to the question of whether there was a duty towards the plaintiff, and whether that duty was breached. It is not dispositive, or apparently even relevant, to the question of proximate cause.

12. The United States is not liable to plaintiff for damages for the death of Richard Montoya.

Any requested Findings of Fact and Conclusions of Law not included herein are hereby denied.